**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**HERMAN SAUSAGE CO., Inc., Respondent.**

No. 17737.

United States Court of Appeals Fifth Circuit.

Feb. 25, 1960.

Rehearing Denied April 8, 1960.

Alfred Brummel, Atty., N.L.R.B., Thomas J. McDermott, Assoc. Gen. Counsel, N.L.R.B., Marcel Mallet-Prevost, Asst. Gen. Counsel, N.L.R.B., Washington, D. C., Stuart Rothman, Gen. Counsel, Frederick U. Reel, Atty., National Labor Relations Board, Washington, D. C., for petitioner.

Alexander E. Wilson, Jr., Atlanta, Ga., Waldo DeLooche, Moultrie, Ga. Wilson Branch & Barwick, Atlanta, Ga., Joseph A. McClain, Jr., Tampa, Fla., for respondent.

Before TUTTLE, BROWN and WISDOM, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

The Board seeks enforcement of its order, 122 NLRB 23, holding that respondent, the Employer, violated § 8(a) (5) and (1) for refusing to bargain in good faith and making unilateral increases in wages during the course of bargaining thereby precipitating an unfair labor practice strike. 29 U.S.C.A. § 158(a) (5) and (1). We enforce.

At the outset it is well to point out the function of this Court and the limited nature of our review. We are not fact finders. Congress has not committed to us the trial of these serious and difficult cases. N. L. R. B. v. Ferguson, 5 Cir., 1958, 257 F.2d 88, 92–93. The heart of this type of case is the *fact* question of good faith. To be sure, since it is seldom capable of patent demonstration and good or bad faith

flows from the way in which subtle and elusive factors are treated, we must, as we do in § 8(a) (3) discharge cases,[1] make certain that the record actually and substantially supports the charge. But while our task in these subjective areas is more difficult than others, it is the same. And on review we must enforce the Board's conclusion of bad faith negotiation if it "finds support in the record as a whole * * * 'even though the court would justifiably have made a different choice had the matter been before it *de novo.*'" N. L. R. B. v. Fant Milling Co., 1959, 360 U.S. 301, 309, note 10, 79 S.Ct. 1179, 1184, 3 L.Ed.2d 1243, 1249, enforced on remand, 5 Cir., 1959, 272 F.2d 773.

Probably in few other instances is the task of judging so difficult. Of this we have remarked before that "there is a duty on both sides, though difficult of legal enforcement, to enter into discussion with an open and fair mind, and a sincere purpose to find a basis of agreement * * *." Globe Cotton Mills v. N. L. R. B., 5 Cir., 1959, 103 F.2d 91, 94. Perhaps it would have been more accurate to say "difficult of legal determination" for once the decision is made, the sanctions of the Act are undoubtedly potent, swift, and adequate. The truth is that objective standards are generally either unavailable or unavailing. And conduct done at one time judicially ascertained to manifest good faith, may, under other circumstances, be a mere pretense.

■ In the very process of bargaining, both the statute [2] by its plain terms and the Court decisions affirm that the making of the labor agreement is not for either Board or Court. The Act spells this out by providing that the mutual good faith "obligation does not compel either party to agree to a proposal or require the making of a concession. * * * *."[3] Again, as in the somewhat analogous problem of § 8(a) (3), discriminatory discharges, the employer may have either good or bad reasons, or no reason at all, for insistence on the inclusion or exclusion of a proposed contract term. If the insistence is genuinely and sincerely held, if it is not mere window dressing, it may be maintained forever though it produce a stalemate. Deep conviction, firmly held and from which no withdrawal will be made, may be more than the traditional opening gambit of a labor controversy. It may be both the right of the citizen and essential to our economic legal system, thus far maintained, of free collective bargaining. The Government, through the Board, may not subject the parties to direction either by compulsory arbitration or the more subtle means of determining that the position is inherently unreasonable, or unfair, or impracticable, or unsound.

■ The obligation of the employer to bargain in good faith does not require the yielding of positions fairly maintained. It does not permit the Board, under the guise of finding of bad faith, to re-

---

1. N.L.R.B. v. McGahey, 5 Cir., 1956, 233 F.2d 406, 413; N.L.R.B. v. Fox Mfg. Co., 5 Cir., 1956, 238 F.2d 211, 214, 215, amplifying the principles discussed in N.L. R.B. v. Coats & Clark, Inc., 5 Cir., 1956, 231 F.2d 567, 572, modifying the rule of N.L.R.B. v. Houston Chronicle Pub. Co., 5 Cir., 1954, 211 F.2d 848, 854. See also N.L.R.B. v. Birmingham Pub. Co., 5 Cir., 1959, 262 F.2d 2; N.L.R.B. v. Drennon Food Products Co., 5 Cir., 1959, 272 F.2d 23; N.L.R.B. v. Ingram, 5 Cir., 1960, 273 F.2d 670; N.L.R.B. v. Hudson Pulp & Paper Corp., 5 Cir., 1960, 273 F.2d 660.

2. Section 8(d) states:
   "* * * to bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, or any question arising thereunder, and the execution of a written contract incorporating any agreement reached if requested by either party, but such obligation does not compel either party to agree to a proposal or require the making of a concession * * *." 29 U.S.C.A. § 158(d).

3. Ibid.

quire the employer to contract in a way the Board might deem proper. Nor may the Board " * .* * directly or indirectly, compel concessions or otherwise sit in judgment upon the .substantive terms of collective bargaining agreements * * * ," for the Act does not "regulate the substantive terms governing wages, hours and working conditions which are incorporated in an agreement." .N. L. R. B. v. American National Ins. Co., 1952, 343 U.S. 395, 402, 404, 72 S.Ct. 824, 829, 96 L.Ed. 1027, 1036, 1037, affirming American National Ins. Co. v. N. L. R. B., 5 Cir., 1951, 187 F.2d 307.

On the. other hand while the employer is assured these valuable rights, he may not use them as a cloak. In approaching it from this vantage, one must recognize as well that bad faith is prohibited though done with sophistication and finesse. Consequently, to sit at a bargaining table, or to sit almost forever, or to make concessions here and there, could be the very means by which to conceal a purposeful strategy to make bargaining futile or fail. Hence, we have said in more colorful language it takes more than mere "surface bargaining,"[4] or "shadow boxing to a draw,"[5] or "giving the Union a runaround while purporting to be meeting with the Union for purpose of collective bargaining."[6]

In the light of these principles, we think the record supports the Board's conclusion. Little purpose would be served in reciting the evidentiary details. It is sufficient to state that we think the evidence, on the record as a whole, warranted the Board in these findings which we merely summarize.

The Union and Employer made a two-year contract in 1955 expiring August 29, 1957. Within the period prescribed, the Union served notice of its demand for changes. This precipitated a counter notice from the Employer. In the initial bargaining sessions,[7] the Employer advanced its main theme, that in view of poor financial showing and the loss of a substantial amount of its business, it would have to have a contract as favorable as its main competitor, Lykes Bros. After the Union furnished a copy of the Lykes' contract, the Employer submitted its counter proposed contract. On comparison of it with the current contract, the Union prepared a list of 26 "takeaway" items[8] which the Employer proposed to delete.

In the third session the Employer submitted a counter proposal on wage increase by classifications to equalize wages with Lykes. The increases, as evaluated by the Employer, amounted to a gross of 7.7 cents per hour, and a net of 1.7 after deducting its estimates of the cost of the "fringe" take-aways, note 8, supra. This was in contrast to the Union's formal notice demand for a 15 cent increase.

At the fourth session, held on the eve of the contract expiration date (August 29), the Employer brought in its lawyer as its spokesman. He rejected the Union's offer to renew the old contract at a 10 cent increase. In doing so, he insisted that the Employer's counter-proposal was the best it could do, and the Union could either accept it or strike. Although both the old and the Lykes' contract had a provision for check-off of

---

4. N.L.R.B. v. Whittier Mills Co., 5 Cir., 1940, 111 F.2d 474, 478.

5. Stonewall Cotton Mills Inc. v. N.L.R.B., 5 Cir., 1942, 129 F.2d 629, 631, certiorari denied 317 U.S. 667, 63 S.Ct. 72, 87 L. Ed. 536.

6. N.L.R.B. v. Athens Mfg. Co,. 5 Cir., 1947, 161 F.2d 8.

7. There were a total of ten bargaining sessions of which seven were held prior to the strike of September 10 and three subsequently. They were held on August

5, 7, 23, 28, 30, and on September 3, 5, 16, 24 and October 2.

8. The Employer seems allergic to the term "take-way." Indigenous to our contemporary world of labels, tags, abbreviations and slogans, no opprobrium attaches. Like primary grade arithmetic, it aptly described the proposed subtraction of existing benefits, most of which were in the categories which both parties willingly describe with another handle— "fringe."

Union dues, the attorney stated that unless the counterproposal was accepted, the Employer would put the proposed wage increases in effect immediately, but without a check-off. The Union asked for time to bring in some outside help. This brought in Ackerman, a representative of the home office of the Union, for the fifth session on August 30. He was, without a doubt, abusive in personal manner, arrogant, overbearing, vulgar and course in his statements made, as they were, in a mixed group. As revolting as his personal conduct must have been, as disruptive as it was to the very nature of a negotiating process, demands and counter demands were knowingly offered and received, and their partial or complete rejection was not due to the presence in two of the meetings of this obnoxious personal obstacle.

After much talk, Ackerman asked if Employer would accept the Lykes' contract "just as she stands." This was rejected. Continuing the negotiations, Ackerman then offered to take the Lykes' contract without the automatic accelerated wage increases for the second and third year, leaving such increases to depend upon the financial position of the company at such future times. This, too, was rejected. The Employer was now demanding, not the Lykes' contract to achieve the equalization earlier expressed, but a contract with no time and a half for Saturday work and without check-off of Union dues. In the next session September 3, Ackerman agreed to all monetary changes, but the Employer's attorney then stated he could sign only the Employer's own counter proposal less the check-off.

In the meantime, on August 30, the Employer put the proposed wage increases in effect. It posted a notice that no deduction was being made, as formerly, for Union dues, and the Employer's management made talks to assembled employees announcing the increase. Both in the previous bargaining sessions and in these speeches, it was stated that the Employer would continue to negotiate, and the raises would not prejudice the negotiations. However, stress was laid on the fact that with no check-off of Union dues their take-home pay would be substantially increased, and that consequently the employees "could negotiate on the contract for three years and not be hurt."

Subsequently, after the strike had started, the president of the Employer on September 13 approached the picket line and, with an evident and reverent sincerity which we in no way disparage, engaged in a prayer service. This occurrence ended in his statement that the employees did not "need a contract to work * * * in the plant [as] all you need is this Bible, and to believe in the Bible and in me."

Negotiations did continue for three more sessions, and some concessions on minor matters were apparently made. They seem to have ended on October 2 at which meeting they discussed at length the Employer's written statement of its current proposals. This had been demanded by the Union in the preceding, 9th, session presumably because it felt the Employer could not be pinned down, and when the Union met a demand, something new was added.

This is, of course, but a thumbnail sketch of the many details which the trier of fact was duty bound to, and did, consider. It highlights a few of the many conclusions drawn from the total evidence showing something other than just mere hard, or hard-headed, bargaining.

The main thesis was the need for comparative, competitive equality with Lykes. When that was offered, the Employer then shifted to something new— absence of Saturday overtime, and no check-off. The new insistence on the absence of check-off also reads into the unilateral wage increase of August 30 a permissible implication of Union disparagement. The Employer's emphasis that without the check-off, the employees would actually get more take-home pay, would become a reality only if, as the statement implied if it did not suggest, the employees would withdraw from the

Union. And conceding the utmost sincerity in the incident on the picket line, the same implication may arise from the earnest plea that the employees rely, not on a contract, but on the Bible and faith in the Employer's chief executive. Other facets, less emotionally charged, also contributed to the image of the Employer, not the Union, as being the protector of the employees. The Employer, for example, was unwilling to put in contract provisions for some of the take-away or similar items, yet insisted that the employees could count on its fairness to afford them the particular benefit.

■ Whether viewed as an independent unfair labor practice, evidence of bargaining in bad faith, or both, the unilateral wage increase of August 30 likewise supported the inference drawn by the Board. The Employer's reliance on N. L. R. B. v. Crompton-Highland Mills, Inc., 1949, 337 U.S. 217, 69 S.Ct. 960, 93 L.Ed. 1320, and N. L. R. B. v. Bradley Washfountain Co., 7 Cir., 1951, 192 F.2d 144, affords no insulation as a matter of law. The Employer seeks to justify the action on the ground that an impasse had arrived. Generally speaking, the freedom to grant a unilateral wage increase "is limited to cases where there has been a bona fide but unsuccessful attempt to reach an agreement with the union, or where the union bears the guilt for having broken off relations." N. L. R. B. v. Andrew Jergens Co., 9 Cir., 1949, 175 F.2d 130, 136, certiorari denied 338 U.S. 827, 70 S.Ct. 76, 94 L.Ed. 503. See N. L. R. B. v. Reed & Prince Mfg. Co., 1 Cir., 1953, 205 F.2d 131, certiorari denied 346 U.S. 887, 74

S.Ct. 139, 98 L.Ed. 391. Cf. Armstrong Cork Co. v. N. L. R. B., 5 Cir., 1954, 211 F.2d 843, 847. Of course, there is no indication that the Union broke off the negotiations, and one thing positively clear in this record is that the Employer did not consider that there was an impasse.[9]

We find no merit to any of the Employer's complaints of procedural deficiencies.

The case was one for the Board to draw the inferences. The record is sufficient. There it ends.

Enforced.

---

[9]. Concerning the talks made to the groups of employees on August 30 announcing the unilateral wage increase and the withdrawal of dues check-off, the superintendent testified:

"Q. Did you feel * * * that negotiations had reached the point where there was no point in further negotiating with the Union?

"A. No sir; in fact, that is one point I made clear in speaking to these people, that I was not there to negotiate a contract, that they had a committee and we would continue our negotiations * * *."

That the Employer's present contention of an impasse is new is reflected by the Employer's exceptions to the Examiner's Report. This excepted to the Examiner's failure to find that the four reasons the wage increase as put into effect were that (a) an increase was inevitable due to rise in cost of living, (b) the employees deserved a raise without delay, (c) a subsequent retroactive wage increase would cause accounting difficulties and (d) financial difficulties to the Employer. The idea of an *impasse* was not even mentioned.