**M. R. & R. TRUCKING COMPANY,**
Petitioner, Cross Respondent,

v.

**The NATIONAL LABOR RELATIONS
BOARD, Respondent, Cross-Petitioner.**

No. 28383.

United States Court of Appeals,
Fifth Circuit.

Nov. 24, 1970.

Warner S. Currie, Albert E. Phillips, Swift, Currie, McGhee & Hiers, Atlanta, Ga., for petitioner.

Marcel Mallet-Prevost, Asst. Gen. Counsel, N.L.R.B., Washington, D. C., Harold A. Boire, Director, N.L.R.B., Region 12, Tampa, Fla., Angelo V. Arcadipane, Atty., N.L.R.B., Washington, D. C., Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, Abigail Cooley Baskir, Atty., N.L.R.B., for respondent.

Before GODBOLD, DYER, and MORGAN, Circuit Judges.

GODBOLD, Circuit Judge:

The principal issue on this appeal is whether in the period July 2, 1967 to January 2, 1968 MR & R refused to bargain in good faith and engaged in mere surface bargaining with the union,[1] in violation of §§ 8(a) (5) and 8(a) (1).

The union was certified in October, 1965 as representative of a unit of approximately 30 local drivers, dockmen and helpers, including part-time "casual" employees, at MR & R's Jacksonville, Florida terminal. Bargaining commenced in January, 1966. The Trial Examiner found:

* * * This is a case involving an attempt to reach a first agreement at the Jacksonville terminal, the result being that the bargaining had literally to be 'from scratch.' The processes of bargaining were hampered by changes in the identity of union negotiators and by frequent and protracted delays not attributable solely to the fault of the Company. While it is true that some of the Company's wage offers were relatively small, it is also true that some of the Union's demands were relatively large. * * * It does not appear that the Company refused reasonable requests to meet or failed to devote sufficient time to the actual negotiating sessions. The evidence seems rather to suggest that if there is any single cause of the failure of the bargaining process here it most probably is the changes of identity of the union negotiators and

their failure to press for more frequent and more extended discussions.

The Examiner concluded the evidence was insufficient to support a finding of failure to bargain in good faith. The Board rejected his findings on this issue and found the company had failed in its bargaining obligation. We decline to enforce on that issue.

This case is not easy. As this court has pointed out, "in few other instances is the task of judging so difficult," as in the refusal to bargain case, where the factors are subtle and elusive, and conduct which at one time may be manifest good faith may, under other circumstances, be mere pretense. NLRB v. Herman Sausage Co., 275 F.2d 229 (5th Cir. 1960). Bargaining lasted for eight months of 1966, with 15 to 20 sessions, followed by a spirited recertification election and then six months of inactivity. In July, 1967 negotiations resumed. After three meetings the parties were close to agreement, but agreement was not reached and the union struck.

A host of events, some important and some minutiae, have been detailed by the Board as evidentiary of failure to bargain in good faith. The limitations of § 10(b) preclude conduct before July 2, 1967 being held unlawful, but 1966 events are considered in the name of "background." When it all ends up, the 1966 background tail almost wags the 1967 dog.

We examine the evidence, mindful on the one hand of our limited scope of review, and on the other of our duty not to rubberstamp Board decisions. There are few credibility choices. The Board did not produce as a witness the chief union negotiator in the 1966 negotiations. The Trial Examiner accepted as credible the chief company negotiator, an attorney, and the Board did not disturb that credibility finding.

This case is one of hard-nosed bargaining from both sides of the table, and use

1. Local 512 of the Teamsters.

by both company and union of naked power. Both company and union flexed their muscles, and the company turned out to be the stronger. But this is not forbidden. We will not restate here the full history of the bargaining, much of which appears in the Board's reported order.[2] Rather we refer to particular aspects which go to the heart of the Board's decision.

(1) The 1966 bargaining negotiations.

The Board strongly emphasizes as background the conduct of the company in 1966 bargaining negotiations. A key conclusion is that the company "chose to renege" on a wage proposal it had made "solely because it believed that it would be unable to avoid agreement on a contract if it left its offer open."

At the first or second session, in January, the company made a lengthy, comprehensive written proposal for a contract, omitting economic benefit provisions. The union responded with its written proposals, and bargaining continued using both proposals. By March 21, after seven to ten sessions, many essential matters had been agreed upon.

On March 21 the first full fledged bargaining for wages occurred. The company offered a 7–6–7 cent per hour increase over the three year term on which bargaining discussions had been based.[3] The union proposed a 10–10–10 increase. The Board found:

> Although the Union then told Respondent that it did not regard the offered increase as adequate, it reconsidered the matter after the meeting had adjourned and advised Respondent a few days later that it was now willing to submit a contract containing the 7–6–7–cent-wage increase offer to a vote of the employees. By letter dated March 29, Respondent advised the Union that as the Union had failed to accept the wage proposal

at the March 21 meeting, the offer had lapsed and that Respondent was not willing to grant a contract on that basis. No economic justification for the withdrawal of the wage proposal was offered to the Union. Nor was any asserted at the hearing. In these circumstances, and in light of what follows, we can only conclude that Respondent chose to renege on the wage proposal solely because it believed that it would be unable to avoid agreement on a contract if it left its offer open.

These conclusions overshoot the mark by what they do and do not say. When the offer was made the union negotiators did not merely express the view that the offer was inadequate but said they "couldn't even consider it" and rejected it somewhat disdainfully. The company negotiator made no representation that the rejected offer would remain open. A few days later the chief union and company negotiators had another conversation about the 7–6–7 figure, either by phone or in a chance meeting on an airplane. The union negotiator said that he "might submit this [the 7–6–7 offer] —might want to submit this to his people, if his superiors would let him." The company negotiator told him the company had never been fully satisfied with its offer and thought it was too much, that so far as he was concerned the offer had been declined and was no longer open. A day or two later the company negotiator wrote the letter referred to by the Board in the above quotation.

These events are not substantial evidence that the union reconsidered and that it was "now willing" to submit the offer to a vote, or, more important, that the company "reneged" on its wage proposal and made an "unexplained withdrawal" of it. The company was not bound to leave open or to reinstate a rejected proposal, cf. NLRB v. Alva Allen Industries, 369 F.2d 310 (8th Cir. 1966); Perfect Service Gas Co., Inc., 146

---

2. 178 NLRB No. 35.

3. There is some testimony that on an earlier date, apparently on a very informal basis, the company had offered a 6–6–6 increase.

NLRB 20,095 (1964); Solar Aircraft Co., 109 NLRB 130. A rule to the contrary would make it well nigh impossible to have effectual give-and-take bargaining.

The Board concluded that in April, 1966 the company told the union it would not make any wage increase proposal "unless and until" two things occurred —pending charges were disposed of by the Board or withdrawn by the union, and the union abandoned its organizational efforts at other MR & R terminals. During bargaining the union stated that it was going to force the company to agree to what the union thought was a good contract by organizing all other MR & R terminals and shutting the company down when it would hurt, that the company had better get the "best hold it could." The local sent representatives to the other terminals, including those outside its jurisdiction. Petitions for elections were filed by the local, and a sister local, for five terminals, and the Teamsters sought to promote elections at other terminals but could not arouse sufficient interest. What company representatives said on this particular subject, according to both union and company negotiators, was that, while the company was not pleading poverty, the pending representation petitions and charges were costing a lot of money, and the company was going to wait and see how it came out with them before it made any further wage offer. This is a long way from the flat refusal to sit down and bargain at all, in the cases on which the Board relies,[4] or even to bargain about wages. The union had injected into the negotiations its use of economic power to force the company to agreement, and had set in process the means to attempt to apply that force. The company did not know whether the union threat was a meaningful one or a paper tiger. It developed that the union lost the elections at Tallahassee and Marianna, Florida, and Atlanta. It won at Quincy, Florida, where there were four people in the unit. It never requested bargaining for that terminal, no bargaining ever occurred, and in 1967 the union disclaimed representation of the unit. A sister local won the election in Pensacola.

The company could not refuse to bargain, either at all or with respect to wages, because of the pendency of charges filed by the union, and reference by the company to the charges was evidence of bad faith. But in the overall picture it has small import.[5] Section 8 (a) (3) charges already had been formally settled when the remark was made. The 8(a) (5) charges were withdrawn in the summer of 1966. The remark was uttered in the context of the company's not making a further wage offer, but at the next meeting the company did make another offer, which the union rejected.

In June MR & R proposed a five-year contract with annual six cents per hour increases such as the union recently had signed with an unrelated employer, if the union would cease its organizational efforts at other terminals. The Board interpreted this as evidence of unwillingness to agree to any contract for increased wages and therefore evidence of bad faith. Its reasoning is not clear. As best we can deduce, the Board considered that coupling the offer with cessation of the organizational efforts was a condition so unpalatable to the union that the offer was an illusory one, not expected or intended to be accepted. But the union considered the offer and rejected it because of dissatisfaction with the amount of the proposed increase and the life of the contract.

■ In September the parties met with a federal mediator. By then the Board elections had been held at the other terminals, and it was clear that the union could not carry out its threat

---

4. *E. g.*, NLRB v. Rybold Heater Co., 408 F.2d 888 (6th Cir. 1969); NLRB v. Southland Cork Co., 342 F.2d 702 (4th Cir. 1965).

5. Nor may this single incident constitute a per se refusal to bargain. *Cf.* NLRB v. Dalton Brick & Tile Corp., 301 F.2d 886, 889 (5th Cir. 1962).

to organize and shut down all terminals. The union proposed the 7–6–7 figure that had been made, rejected and withdrawn in March, or a one-year five-cent increase. The company rejected these on the ground that its bargaining position had become stronger and the union's weaker. The company was not forbidden to use its increased bargaining strength to its advantage, so long as it dealt in good faith in an effort to reach accord. NLRB v. Alva Allen Industries, Inc., *supra.* "[T]here is simply no inconsistency between the application of economic pressure and goodfaith collective bargaining." NLRB v. Insurance Agents' International, Inc., 361 U.S. 477, 494–495, 80 S.Ct. 419, 430, 4 L.Ed.2d 454, 467 (1960).

When the company rejected the union proposals, the union withdrew them, a fact which becomes of significance when considering the October meeting. The withdrawal is not referred to in the Board decision.

The Board found that in the last 1966 meeting, in October, the company "refused to consider any contract contemplating a wage increase." The record does not support this. The union wage offer made in September had been withdrawn. The company made no wage offer. At this meeting there was discussion of recertification of the union. The Board found this originated with the company, that the company questioned the union's majority status when it had no basis to do so, and that termination of certification was asserted by the company as a basis for its position. But the union negotiator employed the prospect of recertification as a negotiating weapon.[6] The two negotiators agreed that the union should request an election "on the basis of a good faith doubt."

The election was held in December, and the Teamsters won. On that day the company notified the union it was "ready, willing and able" to resume bargaining. For six months nothing was heard from the union. In June, 1967, it asked for bargaining to resume, and meetings commenced again in July.

### 2. The 1967 bargaining.

When bargaining began again on July 21, the union was represented by different negotiators than it had in 1966.

The Board concluded that the company approached the 1967 negotiations determined to withhold any economic fruits of bargaining and to avoid consummation of an agreement. Central to this conclusion is the finding that at the first bargaining session on July 21 the company offered terms and conditions of employment less favorable than what it had tentatively agreed to grant in the 1966 negotiations. The Board considered that the company deliberately framed a contract proposal which it could reasonably predict the union would not accept, that it meant to compel discussion of matters seemingly settled in 1966 and thereby prolong and impede the conduct of the new negotiations.

But it is clear that both parties approached the new negotiations considering themselves not bound by the terms hammered out the preceding year. The Board omitted from its decision the fact that the July 21 session commenced with a proposal from the new union negotiators that the parties sign the Teamsters' National Master Freight Agreement and that wage increases of 25, 15 and 15 cents be granted for a three-year period.[6a] On noneconomic matters this was a major departure from what had been agreed on in 1966. The wage in-

---

**6.** The union negotiator said: "I've still got a lot of strength in this unit * * * I'm not going to walk away and leave these people. * * * I am going to get recertified." The company response was that it had nothing to lose by an election and would cooperate and assist the union in getting an election, that either the company or union could request it.

**6a.** These were the increases called for by the National Agreement.

crease demand was 2½ to 3½ times that last made by the union. The company then presented its written proposal (complete except for economic benefits) which embraced changes in several non-economic matters from those agreed on the year before, some of them important ones.[7]

On July 21, in approximately four hours of negotiation the parties agreed on 21 articles (out of 36 contained in the company proposal) and on some sections of the remaining articles.

Union stiffening of demands beyond terms agreed on in 1966 continued at the second meeting, on August 11, 1966, as to overtime and vacation. Also the union demanded the company purchase its health and welfare plan, which was more costly than the company plan which the union had agreed to in 1966. The union reiterated its 25–15–15 wage increase proposal. The company responded with 0–5–5. The Board considered it evidentiary of bad faith that this offer was smaller than any made in 1966. But it was made as a counter to the highly escalated union demand. The union rejected it. The Board found this wage offer was "in effect a take it or leave it offer" because six days after it was made and rejected the company posted a notice to its employees which said that the company had made its "best offer for a three-year contract," that the union had rejected it, and the union had requested another meeting "for what purpose we do not know." With the most liberal deference to expertise, this is not fairly read as a statement that the offer when made a week earlier and rejected, had been on a "take it or leave it" basis. Nor is it fairly read as a statement that an impasse had been reached.

August 31 was the next meeting. Both sides gave some ground. In the two August meetings agreements were reached on many matters, including length of probationary period for new employees, dues checkoff, and seniority. By the end of the meeting the parties were, as the union negotiator described it, "pretty close together." The union indicated that the company offer of 0–5–5 left it no alternative but to resort to economic action. Nevertheless, it agreed to submit the offer to its members for a vote and to bet back in touch with the company negotiator. The union did not communicate further with the company and on September 6 struck without notice.

The union negotiator testified that until the meeting of August 31 the company was trying to bargain, but that the company's conduct on that date was "take it or leave it" which required a strike. This is inconsistent with the view of the Board that in all negotiations since March, 1966 the company had been engaging in pretense bargaining. The president of the local testified that the strike was for economic reasons.

In November the parties met with a mediator. For the second time the union was represented by persons who had taken no part in prior bargaining.[8] The

---

7. The Board emphasizes the addition of a stiffer "management rights" clause, which it views as one to which "no self respecting union could agree." leading to the inference that it was brought forward to avoid reaching agreement. See NLRB v. Reed & Prince Mfg. Co., 205 F.2d 131 (1st Cir.) cert. denied, 346 U.S. 887, 74 S.Ct. 139, 98 L.Ed. 391 (1953) and Vanderbilt Products, Inc. v. NLRB, 297 F.2d 833 (2d Cir. 1961). The Ninth Circuit has pointed out that, arguendo, a party's proposal may be so extreme or bizarre as to give rise to an inference of bad faith but that such a principle, if accepted at all, must be narrowly restricted. otherwise it impermissibly undermines the policy of § 8(d) of the Act. NLRB v. MacMillan Ring-Free Oil Co., 394 F.2d 26 (9th Cir. 1968). In the instant case the company's stronger proposal was countered by the union's presentation at the next meeting of a management rights proposal taken from the National Master Freight agreement.

8. Company negotiators were the same throughout. During the same period that the instant negotiations were going on the company negotiator, Currie, and company president McKenzie successfully negotiated a contract with a different

chief union negotiator did not know what the last offer was that the union had made, and he had made no effort to find out. The new union negotiators proposed a return to the National Master Freight Agreement (which had been brought forward in July and dropped as a basis for discussion) plus the pay scale then in effect in Atlanta. This would have required an increase of either 52 cents or 57 cents per hour for the first year.

This meeting was frustrated by differences over the status of replacements hired for strikers. The union did not request additional meetings. In December, 1967 the company filed a petition for an election. In January the union filed charges of failure to bargain in good faith.

■ From the foregoing it is seen that the Board's treatment of the underlying evidence, largely undisputed, is deficient in two major respects. Recognition is not given to the hard bargaining and exertion of economic force by both sides and to the right of the company to use the stronger bargaining position in which it found itself. "[T]he use of economic pressure by the parties * * * is not a grudging exception to some policy of completely academic discussion enjoined by the Act; it is part and parcel of the process of collective bargaining." NLRB v. Insurance Agents International, 361 U.S. at 495, 80 S.Ct. at 430, 4 L.Ed.2d at 468 (1960). The Board's failure to recognize the applicability of this principle is but part of a broader deficiency, which is its treatment of actions of the company as though existent in isolation, without regard to the context of negotiations in which they arose or the particular actions of the union to which they were responses. Also consideration must be given to the obvious deficiencies of the union in the bargaining process, its changes of

negotiators and their unfamiliarity with the issues. It is for the Board to draw inferences from the evidence. But *Universal Camera* [9] settled that substantiality of evidence is measured by consideration of all the evidence and not merely that which supports the Board's conclusions.

■ We conclude that the Board decision of failure of the company to bargain in good faith is not "based upon such relevant evidence as a reasonable mind might accept as adequate to support it." NLRB v. O. A. Fuller Super Markets, Inc., 374 F.2d 197, 200 (5th Cir. 1967). We are unable conscientiously to conclude that the evidence supporting that finding is substantial.

■ Neither the Board nor this court sits to, directly or indirectly, compel concessions or otherwise sit in judgment on the substantive terms of bargaining agreements or to step into the negotiations and seek to impose its own views of a desirable settlement. H. K. Porter Co., Inc. v. NLRB, 397 U.S. 99, 90 S.Ct. 821, 25 L.Ed.2d 146 (1970); NLRB v. Insurance Agents, 361 U.S. 477, 487, 80 S.Ct. 419, 4 L.Ed.2d 454, 463 (1960); NLRB v. American National Insurance Co., 343 U.S. 395, 404, 72 S.Ct. 824, 96 L.Ed. 1027, 1037 (1954); NLRB v. Herman Sausage Co., *supra*. It is not for the Board to balance the scales or equalize or neutralize pressures in the name of lack of good faith. Collective bargaining is, by its very nature, "an annealing process hammered out under the most severe and competing forces and counteracting pressures." NLRB v. Dalton Brick & Tile Corp., 301 F.2d 886, 895 (5th Cir. 1962).

Our conclusion is not changed by the § 8(a)(1) violations which occurred during the 1967 negotiations. They were peripheral and recognized by the Board as such, involving one employee, a casual, and statements or questions to him by the terminal manager and a foreman.

Teamsters local in Tampa, Florida, covering a unit in another trucking company of which McKenzie also was president.

9. Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

Only one statement had any meaningful evidentiary value as to failure to bargain, which was a remark of the warehouse foreman that the president of the company would let grass grow under the trucks before he would let the company go union.

### 3. Incidents after the strike.

■ The refusal of the company to reinstate strikers was not a violation of the Act, since the strike was not an unfair labor practice strike.[10]

■ As bearing on the refusal to bargain issue, the Board found that MR & R acted unilaterally to abolish the job classification of casual employees, abandon the 90-day probationary period for new employees, and increase the starting wage rate from $2.90 to $3.00 per hour. We agree with the Trial Examiner that there was no duty to bargain with respect to these matters. The company had been struck with no warning, after failure of the union to let the company know the results of a vote on the 0-5-5 offer. MR & R is a common carrier, in a public service business, with not only a right but a duty to operate. It wrote the strikers on September 7 to return to work on September 11 or the company would hire permanent replacements, and from September 7 to 11 used supervisory personnel and temporary replacements brought in from its other terminals. Then it hired replacements as permanent employees rather than as casuals or probationers, at the regular starting rate rather than the probationer rate and without a probationary period. The testimony of company officials was that under the circumstances the company could not afford the luxury of a probationary period. The substantial evidence is, as the Trial Examiner found, that the classification of casuals was not abolished but that the jobs were eliminated temporarily in response to the emergency conditions.[11] The company's actions, under the circumstances, were reasonably directed to insuring the continuance of operations. There was some violence, a state court injunction, and a few strikers were held in contempt. In the exigencies of the situation the company was not required to negotiate with the striking union about these deviations in terms and conditions of employment. N.L.R.B. v. Robert S. Abbott Publishing Co., 331 F. 2d 209 (7th Cir. 1964); Hawaii Meat Co. v. N.L.R.B., 321 F.2d 397 (9th Cir. 1963); Local 1175, Sign & Pictorial Union, etc. v. N.L.R.B., 136 U.S.App. D.C. 144, 419 F.2d 726 (1969).

### 4. Other issues.

■ There is ample evidence to support the Board's finding that the company violated § 8(a) (1) by the interrogation and threats concerning union activities, which we have described above in part 2. As to these violations the Board order will be enforced.

Enforcement is granted in part, denied in part.

---

10. There has not been raised the possibility that a striker who unconditionally applied for reinstatement and whose position was filled by a permanent replacement may be entitled to reinstatement upon the departure of the replacement. *See* NLRB v. Fleetwood Trailer Co.,

389 U.S. 375, 88 S.Ct. 543, 19 L.Ed. 2d 614 (1967); Laidlaw Corp. v. NLRB, 414 F.2d 99 (7th Cir. 1969).

11. A number of casuals have since been hired.