**INDIANA METAL PRODUCTS, a Division of Textron, Inc., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 18238.

United States Court of Appeals,
Seventh Circuit.

April 14, 1971.

Swygert, Chief Judge, filed a dissenting opinion.

S. Richard Pincus, Lederer, Fox & Grove, Chicago, Ill., Edward J. Fahy, Schultz, Fahy & Street, Rockford, Ill., for petitioner.

Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Abigail Cooley Baskir, Herbert Fishgold, Attys., N. L. R. B., for respondent.

Before SWYGERT, Chief Judge, CASTLE, Senior Circuit Judge, and PELL, Circuit Judge.

PELL, Circuit Judge.

This case is before the court on the petition of Indiana Metal Products (Company) pursuant to Section 10(f) of the National Labor Relations Act, as amended, 29 U.S.C. § 151 et seq., § 160(f), to review and set aside an order of the National Labor Relations Board and upon the cross-application of the Board pursuant to Section 10(e) for enforcement of its order. 29 U.S.C. § 160(e). The Board's decision and order, issued January 9, 1970, are reported at 180 NLRB No. 96.

By that order, the Board directed the Company to cease and desist from refusing to bargain collectively with United Steelworkers of America, AFL-CIO, (Union) as the exclusive representative of its employees and from unilaterally changing wages and other terms and conditions of employment without having bargained to a good faith impasse. The Board further ordered the Company not to interfere with, restrain or coerce its employees in the exercise of rights guaranteed them in Section 7 of the Act. 29 U.S.C. § 157. Affirmatively, the Board ordered the Company, upon request, to bargain collectively with the Union as the exclusive representative of its employees, embodying any agreement reached in a signed contract, and to post the usual notices.

## BACKGROUND

On August 30, 1965, following a Board conducted election held August 20, 1965, in which a majority of the production and maintenance employees voted to select the Union as their exclusive bargaining agent, the Union was so certified.

The first bargaining session between the parties was held November 13, 1965, prior to which date the Union had submitted to the Company a proposed agreement. The parties discussed this proposal at the first five meetings, after which the Company, on March 11, 1966, submitted a counterproposal. Fourteen more meetings were held between March 11 and August 2, 1966, during which time the Company proposal served as the basis for the negotiations.

On August 4, 1966 the Union instituted a strike, which lasted until December 28, 1967. Between August 16, 1966 and November 3, 1966, three more bargaining meetings were held.[1]

On October 10, 1966 certain employees filed a decertification petition, seeking to oust the Union as the collective bargaining agent. A second election was held on December 1, 1966 and following the counting of some challenged ballots, the Union was recertified on July 5, 1967.

## SEPTEMBER 28, 1967 PROPOSAL

The first meeting of the parties following the Union's recertification was held August 29, 1967. At this meeting, the parties being unable to agree as to who had convened the session, the federal mediator, who had called the parties together, suggested that they concentrate on the areas in dispute and go through the proposed contract item by item.

In so doing, the parties held firmly to their earlier stated positions in regard to the following issues: Management Rights provision—the two major areas of dispute pertained to subcontracting and foremen performing production

---

1. All of the bargaining between the parties which took place in 1965 and 1966 occurred more than six months before the filing of the Union's charge herein (November 13, 1967), and therefore can serve as background only. 29 U.S.C. § 160(b). *See* Local Lodge No. 1424, Machinists v. N.L.R.B., 362 U.S. 411, 80 S.Ct. 822, 4 L.Ed.2d 832 (1960).

Nevertheless, where there is a history of protracted, but fruitless, negotiations there is always, as stated in M.R. & R. Trucking Company v. N.L.R.B., 434 F.2d 689, 690 (5th Cir. 1970), the inherent danger that "the 1966 background tail almost wags the 1967 dog."

work; union security and checkoff; union representation on the bargaining committee; wages; and reinstatment of strikers. However, some progress was made at this meeting in two other areas: The Company agreed not to discontinue food services in the plant, and the Union reduced its demand for compulsory arbitration to include only grievances arising from layoff or discharge.

The Company, while refusing to accede to compulsory arbitration, recognized that the Union could exercise its right to strike after the exhaustion of grievance procedures. *Cf.* Long Lake Lumber Company, 182 NLRB No. 65 (1970).

At the conclusion of the meeting the parties agreed to resume negotiations at the convenience of the mediator. At the mediator's request, Fahy, the chief Company spokesman throughout the period of negotiations, offered to prepare for the next meeting a revised proposal which would incorporate all changes resulting from negotiations to that time.

The parties reconvened on September 28, 1967 for a bargaining session in the offices of the federal mediator. Fahy presented a revised contract proposal, containing a number of changes from the previous draft which had been the basis of bargaining until that time. In this proposal, the Company included matters which were nonmandatory subjects for bargaining (limitations on membership on union committees and a requirement for 3 years' seniority for membership on such committees, limitations upon employee distribution other than in the manner contractually agreed), withdrew from theretofore agreed conditions of employment (elimination of incentive pay from computation of compensation, elimination of holiday hours from calculation of hours worked for purposes of overtime), and restated matters upon which the Company and the Union had theretofore taken adamant positions (subcontracting, performance of unit work by supervisors, union security and checkoff, and mandatory arbitration).

The Company's change of position on some matters over a year after the strike had begun, standing alone, would not evidence a failure to bargain in good faith; and the trial examiner so found. Caroline Farms Division of Textron, Inc. v. N. L. R. B., 401 F.2d 205, 211 (4th Cir. 1968).

We note that the Company's withdrawal of previous commitments, in addition to being more than a year after the beginning of the strike, was almost ten months after the last previous negotiating session. In the meantime, the plant had a new general manager, Pemberton, who was present during the negotiations in question. It was his desire, certainly not unreasonable in view of the long gap in negotiations, to have certain items he deemed inequitable restored to the bargaining table. Nevertheless, the Board, in finding that the Company's real purpose was to frustrate bargaining and undermine the Union, did expressly attach significance to the withdrawal of the aging commitments.

The testimony of the representatives of the two parties as to what transpired at the September 28 meeting varies both in detail and in total effect.

The testimony of the Union's negotiators, Riffe and Bryant, sets forth the following picture: At the time Fahy presented the revised proposal, he stated that this was the Company's final proposal. The Union negotiators met for a brief caucus to evaluate the document after its presentation, following which Riffe indicated to the Company spokesmen that the new draft was less acceptable than the prior proposal. A discussion of many of the items in the new draft followed. On almost every issue, the Company's answer was claimed to be that the September 28 proposal was its final offer. The meeting concluded with Riffe requesting Fahy to consider making changes in the new proposal, to which Fahy responded by stating he would furnish his answer in writing. Riffe informed Fahy that the answer was needed before a membership meeting to take

place the following Tuesday, October 3, 1967, at which time the proposal would be put to a vote.

The version of the afternoon's events offered by the Company's spokesmen, Fahy and Pemberton, is briefly as follows: No initial reference was made which would indicate that the new draft was submitted as a final proposal. There is agreement as to there having been a caucus, but this was followed by a discussion in the nature of clarification by the Company in response to questions raised by the Union. Thereafter, a second caucus by the Union negotiators occurred. After an extended time, the mediator returned from a meeting with the Union representatives, stating that the hard core issues remained unsolved and that there was an additional issue of the Union's insistence that all strikers be returned to work. The Company at this time learned that there was to be a union meeting in a few days, at which Riffe planned to submit the September 28 proposal to the membership for consideration. Fahy agreed to review the contract proposals and discuss the matter with company officials and, at the suggestion of the mediator, to write a letter to the Union. Riffe then came back to the meeting, at which time he advised that he would recommend to the Union membership that the Company's proposal be rejected.

On September 30, 1967, Fahy wrote to Riffe stating *inter alia*:

"The management of Indiana Metal have considered your suggested changes in the company's final offer. In view of the concessions contained in that final offer, the company does not agree to make any further changes. The proposal presented at our September 28 meeting, therefore, stands as written and represents the company's final offer."

Following the Union's meeting, Riffe wrote to Fahy as follows:

"This letter will serve to notify you that your 'final offer' as outlined in your letter dated 9–30–1967 is com-

pletely unacceptable as a basis for settlement of our dispute and further that I have notified the Federal Mediation and Conciliation Service accordingly."

The Union made no request for further bargaining and filed the charge herein on November 13, 1967.

The crucial issue here seems to be whether the Company proffered the revised contract so as to preclude any further meaningful negotiations.

The trial examiner was presented with irreconcilable characterizations of the Company's September 28 proposal. If the Union's version were accepted, the Company had unlawfully bargained to an impasse on a proposal incorporating nonmandatory subjects of bargaining, a proposal which represented a withdrawal from prior commitments and one which reiterated adherence to adamant positions on mandatory subjects of bargaining.

On the other hand, according to the Company's account, the revised proposal was put forth only to serve as the basis for future bargaining. Furthermore, the Company asserted that it was the Union's decision to submit the revised proposal to its membership which precluded further bargaining, if indeed it was precluded.

The trial examiner was able to resolve the conflict only by crediting testimony offered by the proponents of one version while rejecting that of the other side. He did so and made a finding discrediting Riffe's testimony about the events of September 28, 1967.

In regard to the expression "final offer" contained in the Company's September 30 letter, Fahy testified that " * * * we were asked to consider any changes before [the September 28 proposal] was submitted to a vote of the membership, and when, at least I think when you submit a proposal that the Union says they are going to submit to a vote of the membership that is a final proposal. You don't submit something to the membership to be negotiated."

Concluding that this was a reasonable explanation, the trial examiner found that the Union by its action had established the September 28 proposal as a final one. The examiner, finding nothing unlawful in the Company's behavior, determined that the credited testimony established that the Company put forward its revised proposal of September 28 as the basis for further bargaining and not as a final offer, and therefore the General Counsel failed to establish that the Company insisted to an impasse on an unlawful proposal.

However, the Board, contrary to the trial examiner, found that the Company violated Section 8(a) (5) and (1) of the Act, 29 U.S.C. § 158(a) (5) and (1), by refusing to bargain in good faith with the Union.

The Board further found that as of September 28, 1967, the Company was bargaining in bad faith, even if the proposal of that date was not set forth as a final offer.

### UNILATERAL CHANGES

On November 2, 1967 the Company advised the Union that, effective January 1, 1968, it was instituting three changes in the conditions of employment which had been part of its September 28 proposal.[2] In view of his finding that the impasse which arose was not occasioned by any unlawful conduct of the Company, the trial examiner recommended dismissal of this allegation. The Board, reaching the contrary conclusion that the impasse resulted from the bad faith bargaining of the Company, found these unilateral changes to constitute a violation of Section 8(a) (5) and (1) of the Act, 29 U.S.C. § 158(a) (5) and (1).

### POST-SETTLEMENT NEGOTIATIONS

The examiner commenced hearings on the complaint May 6, 1968. At his encouragement, the two parties entered into discussions which resulted in the execution of a Settlement Agreement[3] providing for the immediate resumption of negotiations. Twelve meetings were held between May 8 and August 2, 1968. The Board concluded that during these negotiations the Company continued to bargain in bad faith, thereby engaging in unfair labor practices in violation of Section 8(a) (5) and (1) of the Act, 29 U.S.C. § 158(a) (5) and (1). This issue was not before the Examiner.[4]

Our review of factual findings by the Board is limited to determining whether such findings are supported by substantial evidence "when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view." Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951). Our function is not to hear labor cases de novo. N. L. R. B. v. United States Railway Equipment Co., 424 F.2d 86, 89

2. Wages were increased 10 cents per hour, Good Friday was made a paid holiday in place of the day after Christmas, and the vacation eligibility date was changed to December 31, with a proviso that no employee suffer a reduction in vacation pay as a result of this change.

3. The Union and the Company entered into an informal settlement pursuant to which, *inter alia*, bargaining was to resume immediately and the Union certification was to be extended for a period consistent with Board decisions. The General Counsel refused to be a party to the Settlement Agreement. The Settlement Agreement was approved by ruling of the trial examiner at the time agreement was reached.

Subsequently the Union joined the General Council in objecting to the settlement, claiming that Riffe was unaware at the May 6 hearing that the General Council was opposed. The Board on the appeal of this issue, while affirming the trial examiner's authority to approve a settlement, reversed him and ordered that the hearing be resumed. The hearing was resumed on October 22, 1968.

4. The charge was filed by the Union on November 13, 1967 and was not thereafter amended. The complaint, which issued on February 29, 1968, made no allegation with respect to this conduct nor was it subsequently amended to include the later bargaining sessions.

(7th Cir. 1970). Thus we may not set aside conclusions reasonably inferred by the Board simply because we would have drawn a different inference from the same facts. *Id.;* N. L. R. B. v. Southern Bell Telephone & Telegraph Co., 319 U.S. 50, 60, 63 S.Ct. 905, 87 L.Ed. 1250 (1943).

However, a reviewing court's task is made more difficult when the Labor Board seems to disregard entirely the findings of the trial examiner. Flack v. N. L. R. B., 327 F.2d 396, 399 (7th Cir. 1963).

In *Universal Camera, supra,* the Supreme Court concluded that both the Administrative Procedure Act and the Labor Management Relations Act "evince a purpose to increase the importance of the role of examiners in the administrative process." 340 U.S. at 495, 71 S.Ct. at 468. "Nothing [in the statutes] suggests that reviewing courts should not give to the examiner's report such probative force as it intrinsically commands." *Id.*

The Supreme Court further explained the use of the trial examiner's findings in the same opinion at page 496, 71 S.Ct. at page 469:

"We do not require that the examiner's findings be given more weight than in reason and in the light of judicial experience they deserve. The 'substantial evidence' standard is not modified in any way when the Board and its examiner disagree. We intend only to recognize that evidence supporting a conclusion may be less substantial when an impartial, experienced examiner who has observed the witnesses and lived with the case has drawn conclusions different from the Board's than when he has reached the same conclusion. The findings of the examiner are to be considered along with the consistency and inherent probability of testimony. The significance of his report, of course, depends largely on the importance of credibility in the particular case."

In reaching the decision that the Company's action in regard to the September 28 meeting was in violation of the Act, the Board concluded that the new proposal was presented by the Company as a final offer, thereby making further negotiations futile. In making this finding, the Board relied upon the following record evidence: (1) Bryant's testimony to the effect that after the Union negotiators returned from the caucus and Riffe indicated his reaction to the new proposal, the Company "indicated that this was their final proposal"; (2) the Company's September 30 letter; and (3) the Company's failure on September 30 or any subsequent time to meet with the Union, to modify its proposals, or to have its September 28 proposal construed in any other way than as a final proposal.

The trial examiner generally credited Bryant's testimony. Bryant did not recall, as Riffe had testified, that Fahy initially presented the revised proposal as a final offer. The examiner determined that it was Riffe's decision to submit the contract to the Union's membership which ended bargaining, and that it was the mediator who first informed the Company's negotiators of this decision. Noting that on September 28 Bryant spent much time in private meetings with Riffe, who must have enunciated his planned course of action during a private session, the examiner found from the evidence that Bryant, an inexperienced negotiator, was confused as to the source of the phrase "final offer" and that it was first used in the Union's private caucus.

The Board maintains that it is not bound by a credibility resolution where, as in the case of Bryant's testimony, the trial examiner made his determination not on the basis of the demeanor of the witness, but on an analysis of the testimony presented.

█ While we do not quarrel with this as a general proposition where the facts are undisputed, we are not unmindful that definitions of credibility do not necessarily confine that concept to the narrow peg of truthfulness. It has been termed as "the quality or power of inspiring belief." Webster's Third New

International Dictionary (1966). "Credibility involves more than demeanor. It apprehends the over-all evaluation of testimony in the light of its rationality or internal consistency and the manner in which it hangs together with other evidence." Carbo v. United States, 314 F.2d 718, 749 (9th Cir. 1963). Evidence, to be worthy of credit, must not only proceed from a credible source, but must, in addition, be "credible" in itself, by which is meant that it shall be so natural, reasonable and probable in view of the transaction which it describes or to which it relates, as to make it easy to believe it. Taylor v. Taylor, 90 A. 746, 751 (R.I.1914). Credible testimony is that which meets the test of plausibility. Lester v. State, 212 Tenn. 338, 370 S.W. 2d 405, 408 (1963).

Differentiating between credibility based upon demeanor and credibility based upon analysis of the evidence could well be a semantical exercise in conceptualism of gossamer calibre.

Here, in any event, the effect of the Board's interpretation of Bryant's testimony is to overrule the examiner's credibility resolutions as to other witnesses which were based upon the witnesses' demeanor and conduct at the hearing as well as what they had to say. Fahy's testimony was in direct conflict with the Board's conclusion, yet the examiner found Fahy to be a credible witness. The examiner similarly credited Pemberton's testimony, which corroborated Fahy's denial of submission of the revised proposal as a final offer. Finally, the trial examiner expressly found Riffe not to be a credible witness based on both Riffe's unconvincing demeanor and his shifting ability to recall events.

Further, we note that the Board in this appeal relies extensively on oral finality statements attributed to Fahy by Riffe, whose testimony, of course, lacks a foundation for reliance as to credibility.

As hereinbefore indicated, the trial examiner concluded that Fahy's explanation of his use of the term "final offer" in the September 30 letter was reasonable. This conclusion is the logical extension from the initial credibility determinations of the two central witnesses, Riffe and Fahy. Similarly, the third evidentiary fact relied upon by the Board, the Company's failure to change its position after September 28, is explainable by the examiner's finding that the impasse which arose was the result of Riffe's decision to submit the contract to the Union's membership.

Thus, while the Board maintains that these three separate factual elements constitute substantial record evidence which supports the conclusion contrary to the examiner's, it is apparent that the characterization of each is dependent upon the initial determination of which party was responsible for the impasse, if any, reached at the September 28 meeting. The trial examiner was able to make this determination only by making credibility resolutions as to the principal witnesses.

The Board made the additional findings that as of September 28, 1967, the Company was bargaining in bad faith and that the later unilateral changes made by the Company were also in violation of the Act. In our view, each of these determinations is the outgrowth of the Board's conclusion that the Company presented the revised proposal as its final offer. Since we have determined that their initial conclusion could only be arrived at by making credibility resolutions, the credibility issues are therefore the most important aspect of the present case.

As the Supreme Court indicated in *Universal Camera, supra,* 340 U.S. 474, 71 S.Ct. 456, the significance of the examiner's findings varies proportionately with the importance of credibility issues. *Id.* at 496, 71 S.Ct. 456. Furthermore, the Board itself has announced a policy of not overruling an examiner's determinations as to credibility of witnesses unless such findings are opposed by the clear preponderance of all the relevant evidence. Standard Dry Well Products, Inc., 91 NLRB No. 103 (1950).

The underlying rationale of the Board's determination to rule contrarily

to the trial examiner is discernible in the final paragraph of the Board's decision and order dealing with the September 28 matter. Here the Board states that it finds that as of September 28, 1967, the Company was bargaining in bad faith, "even if the proposal of that date was not set forth as a final offer." The Board then mentioned that after two years of bargaining the Company made a condition of agreement (an assertion we do not find supported in the record) its proposal on a nonmandatory subject, that in addition certain proposed clauses were very restrictive and limiting and that the withdrawal of prior commitments created a total picture which prevented the Board from being able to view the Company as merely an adamant or hard bargainer.

We must observe on this approach, as did this court in N. L. R. B. v. Lewin-Mathes Company, 285 F.2d 329, 332 (7th Cir. 1960), the following:

> "It seems to us in the instant case that the Board appraised the employer's bargaining position with respect to major issues as a means of ascertaining its good faith. It also passed judgment on the reasonableness of the proposals in reaching its finding of bad faith. In effect the Board's appraisal is to apply pressure upon the employer to make concessions in negotiations. The Board may not either directly or indirectly compel concessions or otherwise sit in judgment upon the substantive terms of collective bargaining agreements."

■ The interjection of nonmandatory issues has no impropriety so long as they are not negotiated to an impasse or the negotiation is not in bad faith, but these are the very issues involved here. The Board's approach seems to predicate the determination of the issues upon conduct which ordinarily is not relevant until after the involved issues have been determined.

■ The case before us has points in common with a recent decision of the Fifth Circuit, M. R. & R. Trucking Company v. N. L. R. B., 434 F.2d 689 (5th Cir. 1970). We agree with Judge Godbold that these cases are not easy as "factors are subtle and elusive, and conduct which at one time may be manifest good faith may, under other circumstances, be mere pretense." Id. at 690. In M. R. & R. Trucking Company the court opined that the Board had failed to give recognition to the hard bargaining and exertion of economic force by both sides and to the right of the company to use the stronger bargaining position in which it found itself. Id. at 695. The court then pointed out that the use of economic pressure by the parties is not a grudging exception to some policy of completely academic discussion enjoined by the Act, but it is a part and parcel of the process of collective bargaining.

Further, because of its applicability here, we reach the same conclusion as the Fifth Circuit Court did in ably stating the matter as follows:

> "We conclude that the Board decision of failure of the company to bargain in good faith is not 'based upon such relevant evidence as a reasonable mind might accept as adequate to support it.' We are unable conscientiously to conclude that the evidence supporting that finding is substantial.
>
> "Neither the Board nor this court sits to, directly or indirectly, compel concesssions or otherwise sit in judgment on the substantive terms of bargaining agreements or to step into the negotiations and seek to impose its own views of a desirable settlement. It is not for the Board to balance the scales or equalize or neutralize pressures in the name of lack of good faith. Collective bargaining is, by its very nature, 'an annealing process hammered out under the most severe and competing forces and counteracting pressures.'" Id. at 695. (Citations omitted.)

We must further observe that the Board's emphasis on a final offer in the

September 28 negotiations and the September 30 letter appears to us to be inconsistent with the realities of the bargaining table. We can give no credibility whatsoever to the belief that an experienced company representative after numerous hard bargaining sessions and a long strike, when learning that the latest proposal would be submitted to a union meeting, should in effect say that this is our present offer but if the Union does not like it come back and we will offer something more. To typify an offer which is to be transmitted to the union membership as having aspects other than those of finality would seem to be an open invitation to a rejection. We conceive it is not an uncommon experience that, before contracts can be hammered out, each side has indicated with the hope of acceptance that the current proposal was a final offer. Such procedure might well be termed the chaffer of the bargaining table. It is true, of course, that words combined with conduct can make it evident that no further offers or concessions will be forthcoming. The Board here purported to find on the total picture such a situation. We do not find the Board's position fairly supported by the evidence.

"The obligation of the employer to bargain in good faith does not require the yielding of positions fairly maintained. It does not permit the Board, under the guise of finding of bad faith, to require the employer to contract in a way the Board might deem proper. Nor may the Board ' *  *  * directly or indirectly, compel concessions or otherwise sit in judgment upon the substantive terms of collective bargaining agreements  *  *  *,' for the Act does not 'regulate the substantive terms governing wages, hours and working conditions which are incorporated in an agreement.' " N. L. R. B. v. Herman Sausage Co., 275 F.2d 229, 231–232 (5th Cir. 1960). (Citations omitted.)

The Board in reaching its conclusion noted the testimony of one Collins that the then plant superintendent, Harper, had a conversation with Collins who was on the picket line. Harper allegedly said that it would not do any good for the Union to win the election then in process, "that they would continue to stall as usual and by the end of the year they would have enough new employees in there to vote the Union out." The timing of this conversation is not clear. The witness, found to be truthful by the trial examiner, whose credibility resolution was here accepted by the Board, testified that the conversation occurred in late May or early June of 1967. As a secondary point on this appeal, the Company contends that the statement occurred more than six months before the filing of the charges and should not have been any support for· the Board's finding. The General Counsel in his brief filed with this court apparently conceded that the statement occurred more than six months before the filing of the charges but asserts that such limited use of the evidence occurring more than six months prior to the filing of the charge tended to shed light upon the Company's state of mind at the bargaining table. In other words, this was background, and the Board did only note the matter in a footnote. Nevertheless, we cannot say that the Board did not give some significance to the purported conversation. We are unable to discern how the computation of six months was arrived at since a period from late May until the date of the charges, November 13, 1967, was less than six months. There was also some indication in Collins' testimony that the conversation took place at the time of a vote on union representation. The second election took place as early as December, 1966, but the challenged ballots were not apparently counted until June of 1967, and this may have been the reference in the testimony rather than the earlier December 1966 election.

We do not deem, however, that it is necessary to dispose of this particular matter on the six months rule.

We find more persuasive here the finding of the trial examiner, also contained in a footnote, which stated the following:

"Collins testified that it was not unusual for Harper to stop and talk when Collins was on picket line duty. Fahy testified that Harper was strictly a shopman who had never been involved in the bargaining and that Fahy, who was chief company negotiator throughout the bargaining, had no discussions with Harper other than to say hello. Harper, who is no longer employed by Respondent, was not called to testify. This incident was not alleged as an unfair labor practice. I find that both Collins and Fahy are credible witnesses, that the conversation occurred, but that Harper had no special knowledge of Respondent's conduct at the bargaining table. Moreover, the evidence as to bargaining between November 1965 and November 1966 establishes that the Union's adamant position on the issues it deemed essential was as responsible for the failure to achieve agreement as was the Company's insistence on its material positions."

Apparently neither the trial examiner nor the Board considered this incident of controlling significance. Neither do we as it was obviously a casual conversation which expressed an individual's opinion not shown to be that of the Company's management. No doubt the Union representative may have entertained such a view as expressed by Harper but no doubt also the Company's representatives entertained the view that the Union's insistence upon its proposals had the effect of stalling any final labor agreement.

Guided by all of the foregoing considerations, we are not convinced that the decision and order of the Board is supported by substantial evidence on the record when considered as a whole. Virtually the Board's whole case is predicated upon the conclusion that the Company was responsible for the revised proposal being construed as a final offer. Since that conclusion is contrary to express credibility resolutions made by the trial examiner, and since the record is lacking in noncredibility related evidence in support thereof, we deny the Board's cross-application for enforcement of its order.[5]

The petition of Indiana Metal Products to have the National Labor Relations Board's Order, 180 NLRB No. 96 (1970), set aside is granted.

It is so ordered.

SWYGERT, Chief Judge (dissenting).

I respectfully dissent. In my opinion the record when considered as a whole gives substantial support to the Board's finding that Indiana Metal Products violated section 8(a) (5) of the Act.

Whether the parties have engaged in good faith bargaining is "largely a matter for the Board's expertise." Fruit and Vegetable Packers & Warehousemen Local 760 v. N. L. R. B., 114 U.S.App. D.C. 388, 316 F.2d 389 (1963). The Board's finding that there was bad faith bargaining on the part of the company turned on far more than a difference between the Board and the trial examiner over credibility resolutions. The entire course of the relations between the union and the company must be considered in determining whether as of September 28, 1967 and thereafter the company bargained in bad faith. Prior to that time, the parties had engaged in many fruitless bargaining sessions—22 between November 1965 and November 1966. Also prior to that time the union had engaged

5. One additional violation was found by the Board: Bad faith bargaining during the post-settlement period. Because of the conclusion we have reached as to the other alleged violations, and in view of the fact that this charge was raised sua sponte by the Board (footnote 4, *supra*), we also deny enforcement to this part of the Board's decision and order.

in a strike, and, following a decertification proceeding had been recertified as the collective bargaining representative of the employees. Against this background, the criticial events on and near September 28, 1968 indicate that the company was engaged in something other than hard bargaining. I agree with the Board's statement: "Rather, it is apparent when the full picture is surveyed, that the Respondent [company] was determined to present a contract document which was calculated to frustrate agreement, produce a stalemate, and undermine the statutory representative, all in violation of Section 8(a) (5) and (1) of the Act."

The Supreme Court has said that the "performance of the duty to bargain requires more than a willingness to enter upon sterile discussion of union-management differences." N. L. R. B. v. American National Insurance Co., 343 U.S. 395, 402, 72 S.Ct. 824, 828, 96 L.Ed. 1027 (1952), and that, "Collective bargaining, then, is not simply an occasion for purely formal meetings between management and labor, while each maintains an attitude of 'take it or leave it'; it presupposes a desire to reach ultimate agreement, to enter into a collective bargaining contract." N. L. R. B. v. Insurance Agents Union, 361 U.S. 477, 485, 80 S.Ct. 419, 425, 4 L.Ed.2d 454 (1960).

When measured against these articulations of the good faith requirement, I do not see how it can be said that the company was actually attempting in good faith to reach an agreement that both parties could live with. Rather, I think its attitude, judged by all the events starting in August 1965 when the union was first certified by the Board, is reflected in the statement of its plant superintendent when he told one of the employees that a union victory in the decertification election would do no good because "they [the company] would continue to stall as usual and by the end of the year they would have enough new employees in there to vote the Union out."