OLINKRAFT, INC., Petitioner,
Cross-Respondent,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent,
Cross-Petitioner.

No. 80–3895.

United States Court of Appeals,
Fifth Circuit.*
Unit A

Jan. 28, 1982.

---

* Former Fifth Circuit case, Section 9(1) of Public Law 96–452—October 14, 1980.

Peyton Lacy, Jr., West Monroe, La., G. Phillip Shuler, III, David L. McComb, New Orleans, La., John Hemrick, West Monroe, La., for petitioner, cross-respondent.

** District Judge of the Eastern District of Louisi-

Elliott Moore, Deputy Associate Gen. Counsel, Vivian A. Miller, N. L. R. B., Washington, D. C., for respondent, cross-petitioner.

Before BROWN and GARZA, Circuit Judges, and BEER **, Judge.

JOHN R. BROWN, Circuit Judge:

This controversy originated in a charge filed by the United Paperworkers International Union (Union) in January, 1980, alleging that Olinkraft, Inc. (Olinkraft) violated the National Labor Relations Act, 29 U.S.C. § 151 *et seq.*, by unilaterally subcontracting work that could have been performed by bargaining unit employees. Following issuance of a complaint and a subsequent hearing, the ALJ concluded that the subcontracting was unlawful. The NLRB issued a Decision and Order on September 30, 1980, adopting the findings of the ALJ. Olinkraft filed a petition for review of the order, and the Board has cross-applied for enforcement of its order. For the reasons set forth below, we enforce in part, deny in part, and remand to the Board for issuance of a new order consistent with this opinion.

### A Christmas Carol, circa 1979

Olinkraft owns and operates a paper mill in West Monroe, Louisiana, and its production and maintenance employees are represented for purposes of collective bargaining by the Union. Each year at Christmas, the mill shuts down for several days, an event called the "cold outage", primarily to perform maintenance on equipment that cannot be accomplished during normal operations. The 1979 Christmas outage, lasting from December 24–29, is the source of this controversy.

Although the regular maintenance employees are usually scheduled to work long

ana, sitting by designation.

hours during a Christmas outage, the remaining necessary work is assigned to subcontractors to ensure completion during the shutdown. This annual procedure has typically created disagreements with the Union. In 1979, Olinkraft carefully planned the outage, lining up many of the subcontractors and scheduling its own employees for 12-hour days during the outage period. On December 17, 1979, Olinkraft met with a Union committee and handed over a list of some 50 to 60 "overload jobs" it believed necessary to subcontract. The committee examined the list and demanded that some of the work be given to Union members.

Olinkraft urges that this Union committee is, and has been for years, the bargaining unit regarding the subcontracting to be done during the cold outages. Prior to 1971, all capital improvement work was contracted out, but that year the Union bargained for a Capital Appropriations Request Crew (CAR Crew) to perform new construction for overload maintenance work. The provisions establishing the CAR Crew also set up the committee to review new construction assignments to outside contractors. From 1971 through 1978, numerous grievances protesting the subcontracting of maintenance work were filed. In 1978, Olinkraft settled the backlog of grievances by paying a sum of money and executing an agreement that it would meet with the CAR Committee seven days prior to subcontracting work to inform the Union of its intention to bring in outside contractors. No representative from the International Union attends CAR Committee meetings.

At the December 17, 1979, committee meeting the Union told the management representative that it appeared that the majority of the work orders were for routine maintenance work. Testimony indicated that the Union local president stated that it would take some time to distinguish the routine maintenance jobs from the new construction work and to review which new construction jobs could be performed by Union employees. Olinkraft's company manager replied that the company had already begun subcontracting, and that a cer-

tain amount of "lead time" was required to obtain the workers needed to do the jobs. The Union then informed Olinkraft that grievances would be filed, and no further discussions took place between Olinkraft and the Union. That day, subcontractors began one of the jobs, but most jobs began December 24 and continued until December 29.

The Union argues that many of the jobs performed by subcontractors could have been done by unit employees when the plant was operational, and also that subcontractors performed jobs that had not been included in the packet given to the CAR Committee. The Board found, in agreement with the ALJ and the Union, that Olinkraft had unlawfully contracted out unit work without affording the collective bargaining representative adequate, timely notice and an opportunity to bargain.

### Adverse Effects on Employees?

Olinkraft primarily argues that no evidence of adverse impact on unit employees was established by the Union. During the 1979 Christmas outage, all unit employees were scheduled for the same amount of work as in past years, and in fact worked more hours than in past outages. Olinkraft points out that the Board's decision (i) reveals an inability to establish conclusively any adverse impact and (ii) even concedes that the evidence did not establish the amount of earnings supposedly lost by unit employees.

From this foundation, Olinkraft argues that the type of subcontracting that causes no replacement of any unit employee, no change in condition of employment, and no impairment of employment security or work opportunities, does not give rise to a bargaining obligation.

### The Obligation to Bargain

In *Town & Country Manufacturing Co. v. NLRB*, 316 F.2d 846 (5th Cir. 1963), this Court held that a company which contracted out work in part to rid itself of a union violated the NLRA, 29 U.S.C. § 158 *et seq.* However, we were careful not to say

that the company is under a duty to agree with the Union that the work may not be contracted out if after reasonable bargaining the company adheres to its decision to conduct its business in that way. [We] merely ... hold that the company, rescinding its plan of contracting out its hauling work and reinstating its employees, as ordered by the Board must in good faith bargain with the Union which has been certified as employees' representative, upon the question whether the company should not return to its former method of doing its hauling with its own employees.

316 F.2d at 847. Shortly after that opinion, the Supreme Court addressed the duty to bargain with regard to contracting out work:

> Experience illustrates that contracting out in one form or another has been brought, widely and successfully, within the collective bargaining framework....
>
> We are thus not expanding the scope of mandatory bargaining to hold, as we do now, that the type of "contracting out" involved in this case—the replacement of employees in the existing bargaining unit with those of an independent contractor to do the same work under similar conditions of employment—is a statutory subject of collective bargaining under [NLRA] § 8(d).

*Fibreboard Corp. v. NLRB*, 379 U.S. 203, 211, 215, 85 S.Ct. 398, 403, 405, 13 L.Ed.2d 233, 239, 241 (1964). Thus the contours of our analysis begin to emerge—contracting out work is sometimes a statutory subject of collective bargaining. The Board, in *Westinghouse Electric Corp.*, 150 N.L.R.B. 1574, ——, 58 L.R.R.M. 1257 (1965), specifically set forth the factors to be considered in the determination of the employer's duty to bargain concerning contracting out work:

> [W]here the Board has found unilateral contracting out of unit work to be violative of Section 8(a)(5) and (1), it has invariably appeared that the contracting out involves a departure from previously established operating procedures, effect-

ed a change in conditions of employment, or resulted in a significant impairment of job tenure, employment security, or reasonably anticipated work opportunities for those in the bargaining unit.

This test was applied by the court in *AMCAR Division v. N.L.R.B.*, 596 F.2d 1344, 1349 (8th Cir. 1979). While the company in that suit maintained that its own unit employees were lacking in both skill and numbers to complete the required work during an annual two-week shutdown, "these arguments cannot be used to defeat the employees' right to notice and an opportunity to bargain if, in fact, the employees are adversely affected by the decision to contract the work out." 596 F.2d at 1349. On four of the five jobs contracted out by AMCAR, there was substantial evidence to support the Board's finding that the NLRA was violated. However, on a fifth project, the Board failed to prove adverse impact on the bargaining unit. 596 F.2d at 1350–51. A foundational prerequisite is thus established for the obligation of the employer to bargain before contracting out work, namely the existence of some adverse impact.

### Board Rationale

The Board adopted the findings of facts and conclusions of the ALJ. No disagreement existed as to the facts underlying this controversy, and the dispute centered around whether the CAR Committee was to be a sounding board for *all* subcontracting, including new construction, refurbishing, and routine maintenance. The Union's primary contention was that the 1979 Christmas outage subcontracts were entered into either without giving prior notice to the Union, or without giving adequate timely notice, and in either case without affording an opportunity to bargain. Olinkraft contended that it met with the Union, gave the 7-day required notice, discussed the subcontracting, and thus fulfilled its bargaining obligations.

The ALJ was "impressed", perhaps too impressed, by the testimony of the president of the local Union, particularly with regard to Olinkraft's representative's state-

ment that on the day the Union was notified the subcontractors had been committed, that is, there was no time for the Union to evaluate the subcontracted jobs. Many of the jobs, the ALJ found, could have been performed by unit employees. In addition, Olinkraft, it was found, entered into other subcontracts during the 1979 Christmas outage without informing the Union.

The local president also testified that there would have been a monetary benefit to unit employees in the amount of any overtime that would have been paid had they been able to perform any of the subcontracted work, particularly work that could be performed prior to the outage. This testimony was especially credited by the ALJ because Olinkraft did not rebut it. Olinkraft's own management representative acknowledged that many of the subcontracted jobs of the 1979 Christmas outage were routine maintenance jobs that could have been performed by unit employees if they had the time. Moreover, it was acknowledged that the Union was first informed of the subcontracted jobs on December 17, 1979, after most of the decisions had already been made to subcontract the jobs. An employee testified that many of the jobs could have been performed while the mill was operational.

The ALJ concluded that because the subcontracting caused the replacement of some employees in the bargaining unit with other employees, the subcontracting was a subject of mandatory bargaining under Section 8(b) of the NLRA. Olinkraft, it was found, did not bargain in good faith when it met with the Union on December 17 and announced the subcontracts. The ALJ further found that the CAR Committee was not the proper forum in which to bargain concerning the subcontracting of routine maintenance work, but only for new construction. Thus, even if Olinkraft did give notice to the Union with regard to the subcontracting, it did not give notice to the proper forum for those jobs that entailed routine maintenance work.

In *Westinghouse Electric Corp.*, 150 NLRB 1574 (1965), the Board set forth five factors to be considered in determining an employer's obligation to bargain collectively with respect to subcontracting: (i) whether it was motivated solely by economic consideration; (ii) whether it comported with the traditional methods by which the employer conducted its business; (iii) that it did not vary significantly from what had been customary under past practice; (iv) that it had no demonstrable adverse impact upon the employees in the unit; and (v) that the Union had the opportunity to bargain about changing existing subcontracting practices at negotiating meetings. With respect to (i), the ALJ concluded that Olinkraft was motivated, at least in part, by a desire to have the work performed at its preferred time, rather than a mutually agreeable negotiated time. Considering (ii), the ALJ did find Olinkraft's methods traditional, but added that those methods had been challenged on many occasions by the Union. Upon considering (iii), the ALJ found a significant change in the degree of subcontracting. The ALJ conceded that the (iv) adverse impact on employees was not established with precision, but it found that certain of the jobs could have been performed by unit employees before the outage on overtime. Finally, the ALJ found nothing in the record to demonstrate the (v) opportunity to bargain at general negotiating meetings concerning subcontracting. The ALJ concluded that Olinkraft did not meet the requirements of a *Westinghouse* defense.

### Per Se Violations

■ Olinkraft readily concedes that employers who make unilateral changes in wages or other mandatory subject of bargaining violate Section 8(a)(5) of the NLRA. However, it is urged that there are many areas that are not mandatory subjects of bargaining in which an employer may lawfully act unilaterally. Where a subcontracting decision involves the replacement of unit employees, the employer may not act unilaterally. *Fibreboard*, 379 U.S. at 215, 85 S.Ct. at 405, 13 L.Ed.2d at 241. Yet *Westinghouse, supra*, makes it clear that an employer is not obliged to

consult and bargain with union representative over every particular subcontracting decision. 150 N.L.R.B. at 1577.

Olinkraft urges that the ALJ erred in finding a *per se* violation where there was in fact no replacement of bargaining unit employees. Having found a *per se* violation, the ALJ went on to view the *Westinghouse* factors as a "defense" by Olinkraft. The proper construction of this controversy, it is urged, is that because no replacement of bargaining unit employees was involved, and thus no *per se* violation occurred, the Board must prove, under the *Westinghouse* approach, that the particular circumstances of the subcontracting decision involved a mandatory subject of bargaining.

### No Replacement of Employees Shown

We find that the ALJ was less than objective in his assessment of the unclear record in this case, particularly in light of the five *Westinghouse* factors. First, although Olinkraft unilaterally chose Christmas as the best time for the outage, evidence indicates that it would lose between $600,000 and $750,000 in sales over the four day outage, and thus the decision to maximize maintenance work during that time was based primarily on economic considerations.[1] We recognize that this controversy has been clouded by the problematic fact that although many of the 50 to 60 subcontracted jobs presented to the Union could *only* be performed during an outage, some were not so limited. Continuing our *Westinghouse* analysis, the Christmas outage was clearly a traditional event at the mill, and even though the Union regularly complained of the subcontracts, those grievances alone do not establish unfairness. The amount of subcontracts for the Christmas 1979 outage appears to be greater than usual, but then so were the regular and overtime hours of the unit employees before and during the outage that year. That the employees suffered an adverse impact was never established except by the speculative finding of the ALJ that unit employees probably could have worked more overtime during the weeks prior to the outage. Finally, although it does not appear with certainty that the parties engaged in defective negotiations regarding the subcontracting of routine maintenance work, it also does not appear with certainty that the Union initiated a demand to bargain about changes at general negotiating sessions. On this record, we cannot find the required interference with work to be assigned to the Union, that is, the "replacement" of unit employees by subcontractors.

As the Board held in *Kennecott Copper Corp.*, 148 N.L.R.B. 1653 (1964),

> Subcontracting of unit work without notice to or consultation with the bargaining representative would constitute violation [of the NLRA] if it resulted in "significant detriment."

Under this test, if no significant detriment can be shown, it is doubtful that subcontracting without notice to or consultation with the Union constitutes a violation. The Board applied this criterion in *Allied Chemical Corp.*, 151 N.L.R.B. 718 (1965), and found that where no substantial increase in subcontracts had been shown over the eight years prior to the alleged unfair labor practice, and no workers had been laid off, no significant detriment was established. Addressing the standards set forth by the Supreme Court in *Fibreboard*, and this court's enforcement of *Town & Country Manufacturing Co.*, the Board in another opinion stated:

> The principles of these earlier cases, however, are not meant to be hard and fast rules to be mechanically applied irrespective of the circumstances of the case. In applying these principles, we are mindful that the permissibility of unilateral subcontracting will be determined by a consideration of the setting of each case.

---

1. The record further reveals that the Union bargained for certain holidays over Christmas on which they could not be required to work, thus indicating another economic motivation behind Olinkraft's decision to seek an outside labor force during the outage. Again, we point out that Union employees in fact were scheduled and worked many hours, regular and overtime, during the outage.

Thus, the amount of time and discussion required to satisfy the statutory obligation "to meet at reasonable times and confer in good faith" may vary with the character of the subcontracting, the impact on employees, and the exigencies of the particular business situation involved. In short, the principles in this area are not, nor are they intended to be, inflexibly rigid in application.

*Shell Oil Co.*, 149 N.L.R.B. 305, 307 (1964). If the record in this case revealed the demonstrable adverse impact on the employees in the Union, we would have no difficulty in enforcing the Board's decision on that basis. This has not been established. Therefore, we conclude that no *per se* violation has been shown.

This Christmas story, however, cannot end with that conclusion. Olinkraft entered into an agreement in 1978 that:

> [O]ther than under unusual circumstances it will meet with the Union CAR Committee seven (7) days prior to the beginning of work to be performed by outside contractors . . . . At such meeting, the Company will inform the Union of the name of the outside contractor, the date and duration of the job to be performed, the scope of the job, the estimated manhours, [etc.].

Because of this agreement, we must look more closely at the December 17, 1979, bargaining session.

### Notice to the Union

▆▆▆ At the outset, we must distinguish between full scale collective bargaining and the brief notification required to be given to the Union regarding subcontracts. All that is really required is a fair opportunity for the Union to be advised of what is happening so that the Union can make suggestions for consideration by Olinkraft. Olinkraft is not required to accept these suggestions. The issue becomes whether the notice given to the Union on December 17, 1979, gave the CAR Committee adequate opportunity to bargain with regard to

the contracts that they were capable of performing. As noted above, it is not clear that Olinkraft had a duty to bargain with regard to the outage subcontracting absent such a contractual agreement. However, once it is determined that an employer has a duty to bargain, either because a statute mandates such bargaining or because of a contract, an employer must notify the unit employees "under circumstances which afford a reasonable opportunity for counter arguments or proposals." *A. H. Belo Corp. v. N. L. R. B.*, 411 F.2d 959, 970 (5th Cir. 1969), *cert. denied*, 396 U.S. 1007, 90 S.Ct. 561, 24 L.Ed.2d 498 (1970). The duty to bargain in good faith requires a party to enter into discussion with an open and fair mind. *N. L. R. B. v. Herman Sausage Co.*, 275 F.2d 229, 231–232 (5th Cir. 1960). These broad standards, equally applicable to full scale bargaining and brief notice of subcontract plans, must be narrowly interpreted in the present context. Here, the Union and Olinkraft set forth in a mutual contract the elements of sufficient notice: (i) meeting seven days before job begins, (ii) name of the contractor, and (iii) duration and scope of the job.

The Board reasoned, in accordance with the ALJ's finding, that Olinkraft did not bargain with the proper representative at the December 17, 1979, meeting. Although the CAR Committee was the proper bargaining unit for the subcontracting of new construction, it was not the representative for contracting out routine maintenance work.[2] Moreover, even if the CAR Committee meeting was a proper forum for bargaining, the Board urges that Olinkraft did not satisfy its duty to bargain because it failed to give adequate notice and an opportunity to bargain about the subcontracted work. The Board found that Olinkraft unilaterally made its decision to subcontract, and then entered into the contracts, before it met with the Union. In fact, one contractor began working on the very day that the CAR Committee met. Olinkraft, however, makes a persuasive argument that it

---

2. The CAR Committee was, and had been, the proper bargaining unit for all new construction

*and* overload or extraordinarily large maintenance jobs.

could have easily modified any of the contracts following this meeting, and that it was willing to consider at that time allowing unit employees to complete some of the jobs, yet the Board found that the management representatives at the meeting clearly gave the impression that it was too late to consider changing any of the subcontracts.

■ While Olinkraft's conduct does not exemplify good faith bargaining in full-scale collective bargaining sessions, we find that it was sufficient under the terms of its contract with the CAR Committee. Although Olinkraft's conduct may appear to be an "eleventh hour notification", see *Hartman Luggage Co.*, 145 N.L.R.B. 1572 (1964), at the same time we do not find exemplary attempts to bargain on the part of the Union representative.[3]

*Reviewing the Board's Remedy and Order*

■ Our review in this enforcement proceeding is limited to the question of whether there exists substantial evidence on the record as a whole to support the Board's findings. *NLRB v. Amoco Chemical Corp.*, 529 F.2d 427, 430 (5th Cir. 1976). While we recognize the Board's special competence in labor matters, we find that some of the Board's findings in this controversy lack substantial evidence to support them.

First, we find that the CAR Committee was used as the forum for outage bargaining for the seven years prior to this controversy. As pointed out above, see note 2, the CAR Committee, by the very terms of the contract entered into between Olinkraft and the Union establishing that committee, was the proper bargaining unit for all new construction *and* overload or extraordinarily large maintenance jobs. No demand was made during the CAR Committee meeting for any other meeting or for any other individual to be present for the Union. It was traditional for Olinkraft to subcontract work during Christmas outages, and for Olinkraft to meet with committee and notify it about the subcontracts to be let.

Although some of the Christmas jobs involved routine maintenance, all 50 or 60 jobs were clearly part of an outage package that was properly brought, as in the past, before the CAR Committee. Given the Union's failure to raise the issue at that time and the unique context in which outage subcontracts are scheduled and presented, we find that the CAR Committee was the proper forum in which to bargain with regard to outage subcontracts.

Although one of the subcontracted jobs began on the very day that notice was given, the ALJ did not distinguish between that job and the jobs beginning on December 24–29. We find that, by the very terms of the contract entered into between Olinkraft and the Union, the Union received adequate and fair notice of all subcontracts that were to begin on or after December 24, 1979.

We conclude that the Order and its accompanying remedies that the Board now wants enforced are too broad and sweeping in light of the limited unfair labor practices engaged in by Olinkraft.

*Limited Enforcement and Remand*

■ Although 50 to 60 subcontracted jobs were presented to the Union on December 17, 1979, grievances were only filed on 28 of those jobs. Grievances were also filed on 10 subcontracted jobs that were not part of the packet and of which the Union did not receive notice. We are in agreement with the ALJ that the 10 subcontracts entered into without any notice to the Union violated the agreement between Olinkraft and the Union and constituted an unfair labor practice. Moreover, we agree with the ALJ that, with regard to one of the jobs in the packet, adequate notice was not given to the Union where the subcontractors began work on the very day (December 17, 1979) of the meeting between Olinkraft and the Union. Finally, we agree with the ALJ that five of the jobs in the packet upon which grievances were filed

**3.** Olinkraft points out that it could easily have modified or cancelled its outside contracts if it became convinced that they were excessive or unnecessary in terms of its own manpower.

could have been performed while Olinkraft was in full operation.[4]

■ However, with regard to the 22 other jobs in the packet upon which grievances were filed, the work was not scheduled to begin until at least seven days after the December 17, 1979 meeting. Since this seven-day notice complied with the agreement between Olinkraft and the Union regarding subcontracts, and because the CAR Committee was traditionally the proper forum for bargaining regarding subcontracts, the issue that is dispositive on this appeal is whether the notice given to the Union on December 17 was adequate and constituted bargaining. Even though these 22 subcontracted jobs could have been performed by unit employees, the evidence does not show that sufficient employees were available during the Christmas outage to complete these jobs in the necessary time. In fact, the evidence reveals that unit employees worked more overtime than ever before during the 1979 Christmas outage. The ALJ held that:

> [Olinkraft's] explanations that it did not have enough maintenance employees available to perform the work, or that it was necessary to subcontract during the cold outage, or during no-work days by the Union, did not exonerate [Olinkraft] from its failure to give notice to and negotiate with the Union regarding the subcontracting of unit work. Although on the status of this record, the adverse impact on employees in the unit may not have been established with exactness it nevertheless was established that employees of the unit could have performed, had they been permitted to, certain of the jobs prior to the Christmas outage of 1979 . . . .

We have already conceded that the evidence substantiates this limited holding by the ALJ. Yet it is not possible from this record to determine precisely the amount of work that the unit employees could have accomplished during the Christmas outage

above and beyond that which they worked. Even if unit employees could have worked another few hours of overtime, it is doubtful that they could have performed all of the necessary maintenance work included in the 22 subcontracts. Again, the only basis that this Court has for enforcing the ALJ order is that the notice and bargaining opportunity given to the Union was insufficient.

We find, however, that the only real bargaining requirement in this context is that the Union be given notice of the fact that subcontracts are planned so that the Union can protect its interests and ensure that its own employees are not being replaced or displaced by subcontracting activities. As we have discussed above, many of the 50 to 60 jobs included in the packet presented to the Union on December 17, 1979, could not have been performed by Union employees. That explains why only 28 grievances were filed. The record does not show, however, that the Union was capable of performing these jobs during the Christmas outage. Hypothetically, if Olinkraft carefully scheduled its Christmas outage such that every unit employee who wanted to work was permitted to work regular hours as well as maximum overtime, and subcontracted out the rest of the Christmas outage work, it could be said that the Union would have little to complain of. However, under the agreement with the Union, seven days notice must be given as to any and all subcontracting. Thus, to fulfill that agreement, it would be probable that Olinkraft would simply announce to the Union, in this hypothetical situation, that all unit employees are fully scheduled and all other work has been subcontracted. We could not expect a great deal of bargaining to come from such a session. The "bargaining" was completed when the announcement was made.

The situation before us is identical to that hypothetical. On the one hand, the ALJ found that many of the 1979 Christmas outage subcontracts were jobs that the unit

---

4. To the extent that the Union can establish, on remand, the precise losses in wages to unit employees in terms of over-time in the months

prior to the outage, we find an unfair labor practice on the part of Olinkraft with respect to these five jobs only.

production and maintenance employees could in fact have performed. However, the ALJ also found, and we agree, that Olinkraft carefully planned the 1979 outage such that a maximum number of jobs could be performed using Union employees as far as possible and subcontracting the balance of the jobs. The ALJ found that certain no-work days exist during the annual Christmas outage upon which no employee may be compelled to work. Specifically, the collective bargaining agreement in effect during the 1979 outage lists Christmas eve, Christmas day, and the day after Christmas as no-work days. Since these days fell within the traditional outage, it was justifiable for Olinkraft to subcontract work on these holidays and take advantage of the cold outage.

### Summary and Conclusions

From the above discussion, we draw the following conclusions:

(1) The CAR Committee traditionally functioned as the sounding board for all subcontracting that was to be done during the Christmas outage.

(2) On December 17, 1979, Olinkraft met with the CAR Committee in order to give the seven-day agreed-upon notice in fulfillment of its bargaining obligations. With respect to the subcontracts presented to the Union, with the exceptions of the one job that began on December 17 and the jobs that were not in the packet of which no notification was ever given, no violation has been established. Olinkraft's careful scheduling of its employees to work during the outage, as well as the fact that its employees worked more overtime hours than in previous outages, supports this conclusion.

(3) Violations have been established with respect to the subcontract that began on December 17 [Union exhibit 11(c)], and also the subcontracted jobs of which the Union was not notified [Union exhibits 14(a)–14(j)].

(4) Given the economic importance of the traditional Christmas cold outage, we do not find that Olinkraft acted wrongly in attempting to schedule its own employees to the greatest extent possible while at the same time accomplishing as much work as possible, for economic reasons, during the outage. However, with respect to the five jobs in the packet that could have been performed by unit employees while the plant was in full operation, we find that if it can be clearly established that unit employees were adversely affected by Olinkraft's subcontracting, then a violation has been established.

On the basis of the foregoing, we enforce those parts of the order based upon established violations, and deny enforcement with regard to the subcontracts of which notice was given, and remand to the ALJ to issue an order consistent with our findings.

ENFORCED IN PART, DENIED IN PART, AND REMANDED.

BEER, District Judge, concurring in part and dissenting in part:

I respectfully concur with the majority's conclusion that Olinkraft acted properly in attempting to schedule its own employees to the greatest extent possible while at the same time accomplishing as much work as possible, for economic reasons, during the outage.

I respectfully dissent from that portion of the opinion which affirms that a violation or violations have been established. Of the 28 grievances actually filed, the majority observes: "The record does not show, however, that the union was capable of performing these jobs during the Christmas outage."

I hold the view that no *per se* violations occurred and that Olinkraft's overall conduct did, in fact, exemplify good faith bargaining in all pertinent respects. On that basis, I would deny enforcement in all respects, thus obviating the necessity for remand.