[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The plaintiff, J. Spangler Kieffer, III ("Kieffer), is an attorney-at-law and has brought the present action against the defendant law firm, Danaher, Tedford, Lagnese and Neal, P.C.[1]
("DTLN"), with which he was formerly associated, in a four-count complaint seeking inter alia damages and an accounting. Briefly stated at this point this action involves whether Kieffer was offered an interest in DTLN that included a percentage share of the profits of that firm, what that percentage was and whether he voluntarily terminated his association with DTLN thereby relinquishing any interest he had in the firm.
As instituted, the action was in four counts to which were interposed various special defenses. Although it will not be necessary to discuss in detail the merits of each count because of what occurred at the trial including oral arguments and also the briefs of the parties,[2] it will be useful to outline each count and the special defenses to put this complex matter into proper context.
In the first count it is admitted that DTLN is a professional service corporation organized under General Statutes 33-182a et seq., and that Kieffer is an attorney duly licensed to practice law in Connecticut. To the allegation that "[B]eginning on or about January 1, 1986, the plaintiff became a member principal, or shareholder of the defendant corporation, which at that time was known as Danaher, O'Connell, Attmore, Tedford and Flaherty P.C.,"[3] the answer admits that effective January 1, 1986, Kieffer became a "principal" in the professional corporation known as Danaher, O'Connell, Attmore, Tedford and Flaherty P.C. but denies the balance of this allegation. The defendant DTLN denies the final allegation that "on or about December 1987 it failed and refused to pay to the plaintiff his full and fair share of the profits (annual bonus) of the corporation, to which he was entitled by virtue of his membership in the corporation."
The second count repeats the allegations of the first count and additionally alleges that Kieffer has demanded an accounting CT Page 4424 of his share of DTLN's profits which DTLN has wrongfully withheld from him and that DTLN has failed and refused to provide such accounting. DTLN incorporates its answers to the repeated allegations and denies the additional allegation.
The third count repeats all the allegations of the first count except the final allegation of that count, and additionally alleges that DTLN wrongfully terminated him and withheld compensation due for his services. Again DTLN incorporates its earlier responses to the incorporated allegations and denies the additional allegation.
Finally, the fourth count repeats those allegations of the third count incorporated in that count from the first count and DTLN answers in the same fashion as it did to such allegations in the third count. DTLN, however, denies the additional allegation; that on or abut December 21, 1987, DTLN breached its employment agreement with the plaintiff and withheld compensation due him for his services to DTLN.
Various special defenses have been interposed. The defenses of payment and accord and satisfaction have been set up to all counts. As to the first count there is a second special defense that that count does not state a claim upon which relief may be granted. As to the third and fourth counts, the special defense of failure to state a claim upon which relief may be granted is articulated as his failure to "recite" the existence of an employment agreement that would take him out of the status of an employee at will.
In maintaining that he is entitled to prevail in this action and is entitled to an accounting and damages, the plaintiff contends that three issues are required to be addressed (1) whether he was offered an interest in DTLN that carried with it a percentage share of the profits of DTLN; (2) what that percentage was; and (3) whether he voluntarily terminated his employment with DTLN, thereby "waiving" his interest. The defendant, concentrating on the first count argues that the plaintiff has not set out a right to recover in that count, and, assuming that he has, it has proven its special defenses directed to that count.
At the trial[4] several witnesses testified and a number of exhibits were admitted into evidence. The witnesses who testified at the trial were Kieffer, Danaher, Neal and Michael O'Connell. The latter was a former officer, director and shareholder of the professional corporation when it was known as Danaher, O'Connell, Attmore, Tedford and Flaherty. O'Connell, Attmore and Flaherty had resigned as officers and directors in the spring of 1987 and none are any longer associated with what became DTLN but all do practice law in the Hartford area. Evidence was conflicting and CT Page 4425 generated serious questions of credibility.
The trier of fact determines the credibility of witnesses and the weight to be accorded their testimony and where the evidence is conflicting, its probative force is for the trier of fact to decide. Robert Lawrence Associates, Inc. v. DelVecchio, 178 Conn. 1,14, 420 A.2d 1142 (1979); McNamee v. Woodbury Congregation of Jehovah's Witnesses, 194 Conn. 645, 648, 484 A.2d 940 (1984): Steinman v. Maier, 179 Conn. 574, 576, 427 A.2d 838 (1988). It may also draw reasonable inferences from the evidence. In re Juvenile Appeal (82-AB), 188 Conn. 557, 561, 452 A.2d 113 (1982). The trier may believe all or part of the testimony of a witness. State v. Rothenberg, 195 Conn. 253, 257, 487 A.2d 545 (1985); Gutowski v. New Britain, 165 Conn. 50, 56, 327 A.2d 552 (1979); Rood v. Russo, 161 Conn. 1, 3, 285 A.2d 220 (1971). Moreover, the court is not bound by the uncontradicted testimony of any witness, Bieluch v. Bieluch, 199 Conn. 550, 555, 509 A.2d 8 (1986) ; Acheson v. White, 195 Conn. 211, 217, 487 A.2d 197 (1985), and, "evaluating such testimony, the trial court must assess the credibility of the testifying witness and consider the presence or absence of corroborating evidence." Bieluch v. Bieluch, supra 555-556. "Testimony that goes uncontradicted does not thereby become admitted and undisputed; . . . nor does the strength of a witness' belief [in it] raise it to that level." Stanton v. Jingley, 177 Conn. 558, 563, A.2d (1979). The interest of any witness may also be considered on its issue of credibility. Buonanno v. Cameron, 131 Conn. 513, 515, 4, A.2d 107 (1945); Nesbit v. Crosby, 74 Conn. 554, 564, 51 A. 550 (1902).
Certain circumstances may usefully be set out here and others will be added hereafter as necessary. After a twenty year career in the United States military service ending in 1982, Kieffer joined the law firm of Danaher, O'Connell, Attmore, Tedford and Flaherty in December 1982 as a senior associate.[5] At that time that law firm was a partnership but in October 1983 it was incorporated as Danaher, O'Connell, Attmore, Tedford and Flaherty P.C. These attorneys became its officers and directors. In May 1987, after dissension and turmoil, O'Connell, Attmore and Flaherty resigned as officers and directors and left to form their own law practice. The firm name was changed at that time to Danaher, Tedford, Lagnese and Neal. Danaher and Tedford continued as officers and directors and were joined thereafter by Neal and Lagnese who each also became officers and directors. Kieffer was never an officer or director of either of these two professional corporations. Danaher, Tedford, Lagnese and Neal will hereafter be referred to as the senior partners unless otherwise stated.
The plaintiff's major interviews leading to his association with the firm in 1982 were with Danaher. There was no written agreement with reference to Kieffer's becoming associated with the CT Page 4426 firm at that time. He was originally retained to work with Danaher to assist him in coordinating the defense nationally of the firm's major client, Pittsburgh Corning Corporation ("PCC") in its asbestos litigation. This included in the main of coordinating discovery among firms throughout the United States defending asbestos litigation against PCC and some other asbestos companies. It did not involve trying cases and Kieffer did not try any cases but did argue some motions while at DTLN. He indicated to the senior partners an interest in developing a Connecticut practice and maintains that he was promised that that could be developed.[6]
For several years the plaintiff's performance was considered satisfactory. There was a change in 1985 which included absenteeism and a drop in his billable hours to somewhere between thirteen hundred and fifteen hundred hours.[7] In late fall 1985 Kieffer asked Danaher if the latter would accompany him on a visit to a psychiatrist he had been consulting because issues related to Kieffer's work had come up. Danaher attended one session with Kieffer's psychiatrist who said that he had been seeing the plaintiff. The psychiatrist indicated that anxiety had been expressed by the plaintiff concerning his "potential" as a "partner" with the firm. Danaher discussed issues involving partnership with the psychiatrist and had "some general discussion about that whole subject matter" with him during that visit.
Immediately following that session, Danaher went back to the other principals of the firm, reported what had happened and he raised the subject of the plaintiff becoming a principal of the firm and he advocated that advancement. During this meeting concern was expressed about Danaher's proposal because "there was a general awareness that [Kieffer's] performance of late had not been good." Danaher, however, said that he thought Kieffer was "going through a tough time," that prior to that he had been "supportive of the firm" and that now the principals should "support him and give him a boost of confidence and recognition." The result of the meeting was it was agreed that the plaintiff become "a principal of the firm" and Danaher was to convey that to Kieffer.
Thereafter, in late 1985, Danaher spoke to Kieffer concerning this. What occurred is the subject of serious conflict in this case. Essentially, Kieffer maintains that he was told by Danaher that he would be a "percentage partner" in the firm, that "the partners and he [Danaher] wanted to offer me a percentage partnership in the firm." He further contends that he asked Danaher what the percentage would be and that he was, in effect, told by him that "they" had not finished writing or preparing the partnership agreement but that Danaher "hoped" to have that completed soon "and they would be at that point, in those papers CT Page 4427 tell me what that percentage would be." Danaher, however, said that at that time Kieffer was "offered the opportunity to be a principal of the firm", that "he believed [he] told [Kieffer] that he would get a salary and a bonus." He further indicated that he did not recall that at that time or any later time telling Kieffer that he was being offered a "percentage partnership." Kieffer's becoming a principal meant, Danaher said, that Kieffer would participate in most of the management issues involving the firm. . . ." Kieffer, Danaher said, became "clearly a junior partner at that time as was Henry Beck." Beck's compensation, Danaher testified, was that of a salary and a bonus which was determined by the board of directors "based on performance and a lot of subjective issues."[8]
In any event, the firm of Danaher, O'Connell, Attmore, Tedford and Flaherty P.C. did send out an announcement that the plaintiff, as of January 1, 1986, had become a principal of the firm. In 1985 he had received a bonus of $10,000.00. When he became a principal he received a $10,000.00 increase in his salary from $50,000.00 to $60,000.00.
Michael O'Connell, one of the officers and directors who left the firm in 1987, testified that he recalled the impromptu meeting of late fall 1985 referred to by Danaher. He had no "recollection one way or the other" as to any discussion at that time as to what the terms of Kieffer's partnership would be. O'Connell further testified that he had no recollection of any discussion with Danaher concerning the terms that Danaher "or someone else may have offered to Mr. Kieffer of a principalship or partnership." He did not know whether such discussions occurred or not. Moreover, he had no recollection of any discussion "along those lines" with any other of the then officers or directors. During the entire period that O'Connell had been a director and officer he knew of no written agreement concerning the compensation of any attorney "no matter what their capacity was."
During O'Connell's testimony an exhibit entitled "Resumed Annual Meeting 2/15/86" was introduced as an exhibit. It was his handwritten notes made by him concerning that meeting. That exhibit contained, inter alia, this notation: "- J. — $60,000 
unspecified percentage." O'Connell testified that he had no present recollection of any discussion concerning that note, that he had no "ability to recall it now" and that he could not recollect who was at that meeting. Later he said that while that exhibit did not "refresh [his] recollection as to any specifics, it helps [him] to a degree in terms of recalling the general situation." He then said they "talked about a lot of things including Jay [the plaintiff] and his status in the office but [O'Connell] cannot recall . . . specific discussions." What followed in his testimony shed little light on this matter. At one point CT Page 4428 in his testimony he said that he did not recall any specific conversation dealing with when they would address the matter of fixing any percentage for the plaintiff. On cross examination he admitted that he had no recollection of any discussion with Danaher concerning the terms that Danaher or someone else may have offered Mr. Kieffer a principalship or partnership as well as having no recollection of any discussion "along those lines" with Tedford, Lagnese, Attmore or Flaherty who were then all partners. It should be pointed out that while O'Connell could not recall who was at the meeting of February 15, 1986, immediately under the caption "Resumed annual meeting 2/15/86" is the notation "All partners". Giving O'Connell's evidence its best possible interpretation suggests that, sparse as it is, some modicum of support for the plaintiff's claim.
Thereafter, some time in May or June 1987 the matter of the plaintiff's "bonus" for 1986 came up and Neal asked him what he felt would be a fair "bonus." Kieffer responded by saying that the firm had always been fair with him, that he did not have a figure in mind and he expected that it would be a "fair bonus." At that time the plaintiff did not say anything about being entitled to a percentage of the firm's profits, nor did he make any claim that he had an agreement for a percentage partnership. Moreover, he made no suggestion that the bonus be based on a percentage of the firm's profits. While there were some "misgivings" about his performance over the bonus period involved, the officers and directors, recognizing his loyalty during the turmoil involving the since departed attorneys, and some "new vigor" on Kieffer's part, awarded him a twenty thousand dollar bonus at a meeting in June 1987 at which the plaintiff was present. At that meeting Danaher did not use the phrase "percentage partnership" or talk to the plaintiff about a percentage in any way in terms of his compensation. Kieffer was also informed at that meeting that future bonuses would be up to the evaluation of him by the senior partners and that this June 1987 bonus was not to be considered "precedent setting.". At that time Kieffer seemed pleased with this bonus and thanked them. From that time until December 21, 1987 Kieffer never expressed any dissatisfaction with that bonus.
In support of his claim that he is entitled to a percentage partnership share of the profits of the firm, the plaintiff points to the firm's federal income tax returns for fiscal 1985-86 and 1986-87 which are in evidence. The fiscal 1985-86 return which was filed in the name of Danaher, O'Connell, Attmore, Tedford and Flaherty, P.C., recites that the plaintiff owned 2% of the common stock of the corporation. The plaintiff admits that he was never issued any stock. The evidence is that he was never a director or officer of either of these professional corporations. The statutory scheme, i.e., General Statutes 33-182a et seq. in CT Page 4429 Chapter 594a which authorizes professional service corporations, inter alia, in 33-182i, "Chapter 599 [Stock Corporations] is applicable to a corporation organized pursuant to [Chapter 594a] except to the extent that any of the provisions of [Chapter 594a] are interpreted to be in conflict with the provisions of . . . Chapter 599, in which event the provisions of [Chapter 594a] shall take precedence with respect to a corporation organized pursuant to the provisions of [Chapter 594a]." This court does not perceive that any of the provisions of Chapter 594a, insofar as the plaintiff's claim arising out of these tax returns might touch his percentage partnership claim, conflicts with any provision of Chapter 599. The court also perceives that33-182j, which concerns the applicability of other law likewise, in this case permits the applicability of other law, not only including that in Chapter 599 but relevant cases and legal principles.
Whether the plaintiff was a stockholder or not is not, supportive of the plaintiff's position as to the tax returns. Even assuming he was, that did not entitle him ipso facto to a share of the firm profits. "Ordinarily the right to declare a dividend is vested in the board of directors, and not in the stockholders or in the corporate officers." 11 Fletcher Cyclopedia Corporations, 5347; Richter and Company v. Light, Trustee,97 Conn. 314, 116 A. 600 (1922); 188 Am. Jr.2d Corporations, 1204. It is the declaration of a dividend by the board of directors that times the vesting in the stockholder of share or amount of the dividend so declared. Richtor Co. v. Light, Trustee, supra 366; Caleb Co. v. E. J. DuPont de Nemours Co., 615 F. Sup. 96, 104
(S.D.N.Y. 1985). As noted, the plaintiff was never an officer or director. Under all the circumstances, the court cannot accord to these tax returns the weight contended for by the plaintiff.
In September 1987, the plaintiff wrote to the senior partners a memorandum entitled "1987 Fiscal Year Review of J. Kieffer." He opened this memorandum directed to Danaher, Tedford, Lagnese and Neal, by indicating that Lagnese had told him that an accountant was coming later that month to review individual tax situations for 1987. He said that he needed to know his total compensation up to September 30, 1987 as well as his salary for fiscal 1988 in order to make some decisions and to advise the accountant of his situation. He went on to state that he wanted to give the senior partners a written presentation for his review in case there was no opportunity for them to meet with him before that time. The memorandum then recites his activities with and for the firm and his hopes for the firm's future as well as his own. As to the latter and referring to the recommendation of "Henry Beck, my co-junior partner" the plaintiff counseled the quick development of a "written partnership compensation scheme." In doing so, he stated that "he [has] had no idea for two years as a partner where [he CT Page 4430 stood] in relation to senior partners or where [he could] expect to find [himself] with respect to Pat and Peter[9] or to you four as the years pass." The plaintiff followed this with the comment that that "does not lead to the development of confidence in one's security or the longevity of his tenure if he or she is provided no insight into what appears from what I was briefly told in June [1987] would be a completely subjective evaluation plan." The memorandum closed by noting that his "fiscal year 1986 compensation (bonus) was $20,000.00" and pointed out parenthetically that Danaher had informed him in June that 1986 profits were $300,000.00 to $400,000.00.
This September 1987 memorandum, which encompasses about four handwritten pages on a legal pad, is as significant for what it does not say, either expressly or by fair inference, than what it does state when one considers the claims the plaintiff is making in this case. It nowhere indicates that he had in September 1987, as he later and now claims, a contract or agreement for a "percentage partnership" dating from his late 1985 discussion with Danaher upon his becoming a principal in January 1986 nor does he claim that his status is such that he is entitled to a share of the corporate profits. He does concede in this memorandum that he is a "co-junior partner" at least with Beck. While now claiming the entitlement to a percentage share from January 1986, it seems anomalous that he never fairly suggests anywhere in that September 1987 memorandum that he is owed or entitled to some percentage share of the profits. This hardly fuels his ultimate claims in this case.
Other events in 1987 illuminate the circumstances demonstrating that the plaintiff has not sustained his burden of proof in this case. Family members, including the plaintiff's in-laws who resided in West Hartford as did the plaintiff and his wife, were aware of the turmoil that had gone on at the plaintiff's law firm and that he "might need a job." Mrs. Kieffer's sister was married to a trial attorney, Barry Nace, who practiced in Washington, D.C., and he in turn was aware that Kieffer was concerned over what had been going on at the plaintiff's firm and that he "might need a job." Sometime before Thanksgiving 1987, Kieffer received a telephone call from David Austern who was general counsel for the Manville Personal Injury Settlement Trust ("Manville Trust") in Washington, D.C. Austern, told the plaintiff that he knew Nace who, in turn, had mentioned to Austern that the plaintiff was working in asbestos litigation and was knowledgeable in managing such litigation. Austern expressed an interest in talking to Kieffer because Austern was then setting up an asbestos litigation management operation for the Manville Trust. He told the plaintiff that he was hiring several attorneys for that operation. About a week after the call from Austern, but before Thanksgiving, the plaintiff went to CT Page 4431 Washington for an interview with Austern. He brought, at Austern's request, a brief written outline of his prior experience. He told no one at his law firm that he was going to Washington. After this interview with Austern, the latter told the plaintiff that he would get back to him. Sometime after Thanksgiving, and perhaps a week before December 18th, Austern called Kieffer and told him that the Executive Director of the Trust, Marianna Smith, wanted to talk with Kieffer in Washington. The plaintiff had learned during his pre-Thanksgiving meeting with Austern that anyone that Austern hired would have to be approved by Marianna Smith. Austern and the plaintiff agreed upon December 18, 1987 for this next meeting. The plaintiff went to Washington on that date and met with Marianna Smith. He did not tell any of the partners or anyone in his Hartford office that he would be interviewing in Washington on December 18, 1987.
Between the two Washington interviews it is revealing in this scenario to note the meeting of the plaintiff, Neal and Tedford on or about December 8, 1987, concerning the plaintiff's bonus for 1987. The senior partners had decided upon a twenty thousand dollars bonus and Neal and Tedford so informed Kieffer. The plaintiff was upset with this because he felt he deserved more, that he "knew" that the firm had a better year in 1987 than 1986 for which he had also received a bonus in the same amount. Tedford and Neal responded that based on his performance they believed that it was a "very good bonus" and was "fair." Tedford became upset at this and left the meeting. Kieffer requested Neal to ask the senior partners to reconsider. Neal said that he would do so but indicated that he did not hold out any hope that they would. There was no claim during this meeting by the plaintiff that he was entitled to any percentage of the firm's profits by virtue of any agreement as was later asserted. Neal did discuss the requested reconsideration with the senior partners but no change resulted in the amount of the bonus. Neal told this to Kieffer on December 11, 1987. At that time Neal also told him that he could have the bonus check issued right away and the plaintiff indicated that he did want the check right away. A DTLN check, marked "Bonus Payment", dated December 11, 1987[10] was issued to the plaintiff who admits that he cashed or deposited it in his account on the very same day it was issued.
Other events that occurred still later in December 1987 disclose additional matters bearing significantly upon the plaintiff's claims. They are best put in perspective by first setting out in detail the plaintiff's letter of December 21, 1987 addressed to Danaher, Tedford, Lagnese and Neal. This letter initially states that he is making "a renewed request" in writing that they "immediately reconsider the monies due [him] as a partner for the 1987 calendar year." In this typewritten letter he refers to a number of matters relative to his relationship with CT Page 4432 the firm. He states that in January 1986, Danaher offered him a "percentage partnership on behalf of the firm's principals." Stating that he was "admittedly . . . never told" what that percentage was, he maintains that he has pressed unsuccessfully for a written partnership agreement. Further, he states that he accepted the offer of a partnership with the understanding that his "percentage profit would increase each year, eventually equalling all other partner's shares." This letter also maintains that his concerns about expanding his practice beyond asbestos litigation have not been addressed. Stressing his reliance on representations, particularly by Danaher, he reiterates that he continued to represent PCC nationally but that limitation has harmed and not enhanced his career. In addition, he expressed his dissatisfaction with his 1987 compensation, which, he contends, should have been greater than that for 1986 because he had a copy of the firm's "1987 Statement of Income for the twelve months including September 30, 1987", which he said was much larger than for its 1986 income year. Moreover, he objected that under the 1988 proposed partnership agreement, as he understood it, every partner's interest except that of the four senior partners "would be determined by you on strictly subjective criteria." Emphasizing his entitlement to a percentage of the firm's profits, he demanded that he receive within twenty four hours of the receipt of this letter "ten percent of the total 1987 calendar year profit of [the] firm" as well as "a signed and notarized letter from you listing and attesting to the authenticity of the figures on which that ten percent (10%) share is based." That letter, he continued, was also to set "a date certain" when he would be provided a written partnership agreement "encompassing the understandings that [the plaintiff] and Neil [Danaher] entered.[11] The letter concluded with a summary of what he believed he was entitled[12] to because of the breach of the partnership agreement. The final sentence was: "I will expect your written reply by 10 a.m. Tuesday, December 22, 1987."
By a letter dated December 22, 1987, Lagnese wrote a reply on behalf of herself and other members of the firm in which she indicated that they were shocked by the "sentiments" expressed by the plaintiff's letter which she said "reflects a number of unfortunate misperceptions [by him]. . . ." She stated that at this request they had carefully reconsidered "[his] 1987 performance bonus and [his] 1988 compensation" and that they considered it "eminently fair" and did not feel that any modification was justified. Pointing out that the situation required prompt consideration, she proposed a meeting on December 28, 1987 to talk about the whole matter. She asked him to call and confirm. The plaintiff never accepted that invitation.
By letter dated December 22, 1987, the New Haven law firm representing Kieffer in this action wrote DTLN indicating that it CT Page 4433 understood that his relationship with DTLN "had been terminated as the result of [DTLN's] breach of its agreement with Mr. Kieffer." The plaintiff never returned to work at DTLN after December 17, 1987. His cessation of employment at DTLN was voluntarily done by him.
Of significance in fitting the plaintiff's letter dated December 21, 1987 into the mosaic of this case, is the fact that that letter is identical with the draft of a letter by the plaintiff which was faxed by the plaintiff's father-in-law to his present New Haven counsel on December 16, 1987 according to the fax legend at the top of the letter. Both letters are in evidence and the plaintiff admits that the letter actually delivered to DTLN under date of December 21st had been in the process of being drafted before December 18th as well as admitting that he had spoken to New Haven counsel "somewhere between December 8th and December 19th." The December 18th meeting with Marianna Smith at the Manville Trust in Washington had preceded the delivery of the plaintiff's letter to DTLN but had not preceded its composition as the fax copy of December 16, 1987 bears out.
On December 18, 1987, which was the day Kieffer had met with Marianna Smith in Washington, a letter, dated that date over the signature of David Austern, was written to the plaintiff at his West Hartford home address. The letter begins "I appreciate very much your interest in the Manville Personal Injury Settlement Trust and am pleased to offer you a position as Assistant General Counsel. The annual salary rate for that position is $85,000. Your anticipated starting date is March 4, 1988 . . . ." The final paragraph is as follows: "As you know, the Trust is embarked on an historic and important mission to help the victims of asbestos disease. I am happy you have joined us in this effort and look forward to working with you." The plaintiff insists, without a credible explanation, that he did not receive this letter until January 5, 1988, approximately seventeen days later. He maintained that he had not accepted an offer to work for the Manville Trust until January 6, 1988[13] as he did not receive Austern's letter of December 18, 1987 until January 5, 1988.
The plaintiff further testified in support of that position that his father-in-law and brother-in-law were during December 1987 aware of his problems at the firm as well as their having some dissatisfaction with the manner certain of their corporate legal business had been conducted at that firm. After December 18th and before January 5th, his wife's brother asked the plaintiff if he would like to work for the management side of their family construction company. The plaintiff did not, he testified, rule that possibility out until he received the offer from Austern on January 5th. The court cannot accept the plaintiff's evidence on this phase of the matter, particularly CT Page 4434 that he did not know that the position with the Manville Trust was being offered to him until January 5, 1988.
The credible evidence also disclosed that the plaintiff was, while he resided in Connecticut, much more than passively interested in returning to the Washington, D.C. area. The plaintiff had been born in Maryland and gone to high school in Virginia. Before leaving the army in 1982 he had spent approximately the prior fifteen years in the Washington, D.C. area. Prior to their return to Connecticut in 1982, his wife, whom he had married in 1978, had spent approximately ten years in the Washington area. The plaintiff also testified that he had discussed with his wife for several years that he missed Washington and was interested in returning there, that he did not particularly like Hartford and that if there was a chance he "might" want to return there. She was against that. It also appears that his in-laws as well as his wife would prefer he remain in Connecticut. She suggested that he endeavor to find other employment here, but he sent out no resumes in Connecticut although he "talked to people." Within about a weekend, in the January 9th and 10th time frame, the plaintiff made an offer on a house in Bethesda, Maryland, after an open house on his West Hartford home signed a contract on this Connecticut home and then signed a contract on the Bethesda house. He and his family have resided in the Washington area where is still with the Manville Trust and they still reside there. The opportunity presented by a position at Manville Trust fulfilled the plaintiff's long — standing desire to return to the Washington area.
It has been said that "[A] contract is a promise or set of promises, for the breach of which the law gives a remedy, or the performance of which the law in some way recognizes as a duty." Williston Contracts 1 (3d ed 1957); Restatement Second Contracts 1 (1981); Restatement Contracts 1 (1932). Our Supreme Court has said "[A] promise is a declaration by any person of his intention to do or forbear from anything at the request or for the use of another." A proposal when accepted, becomes a promise. Pollock on Contracts (9th ed) pp. 1, 6." Finlay v. Swirsky, 103 Conn. 624,632, 131 A. 420 (1925). A "promise" has also been defined as "an undertaking, however expressed, either that something will happen, or that something shall not happen, in the future." Restatement Contracts 2(i); see Plumbing Shop Inc. v. Pitts,408 P.2d 382, 384 (Wash. 1965); Germann v. Matress, 260 A.2d 825, 859
(N.J. 1970); Bowman v. Hill, 262 S.E.2d 376, 377 (N.C. 1980). "It imparts mutuality and is `an expression that the promisor will conduct himself in a specified way or bring about a specified result in the future, communicated in such manner to a promisee that he may justly expect performance, and may reasonably rely thereon. Corbin, Contracts, 13, p. 20 (1952).'" Germann v. Matress, supra. It is a basic principle of contract law that in CT Page 4435 order to form a binding contract there must be mutual assent and "to constitute an offer and acceptance sufficient to create an enforceable contract, each must be found to have been based on an identical understanding by the parties. Shulman v. Hartford Public Library, 119 Conn. 428;, 433, 177 A. 269 [1935]." Bridgeport Pipe Engineering Co. v. DeMatteo Construction Co.,159 Conn. 242, 249, 268 A.2d 391 (1970); Zohoracky v. Edward Chevrolet, Inc., 37 Conn. Sup. 751, 754, 436 A.2d 47 (1981). The, term "offer" has been described as a manifestation of willingness to enter into a bargain, which would justify another person understanding that his assent to that bargain is invited and will conclude it. Restatement Contracts Second 24. Thus, an "offer" creates a power of acceptance in the offeree to transform the offeror's promise into a contractual obligation. See 1 Williston, Contracts (3d Ed. Jaeger) 50. "Where terms for changing the legal relations between two parties are offered by one party to another, those terms must be explicitly, fully and unconditionally accepted to effect such a change in legal relations and constitute a binding contract." Woodbridge Ice Co. v. Lemon Ice cream Corporation, 81 Conn. 479, 487, 71 A. 577 (1909). It is a basic principle that there must be valid consideration to support a valid contract. See State National Bank v. Dick, 164 Conn. 523,529, 325 A.2d 235 (1973). "[W]hether a contractural commitment has been undertaken is ultimately a question of the intention of the parties." Otis Contracting Co. v. S. Schinella Son, Inc.,179 Conn. 704, 709, 427 A.2d 856 (1980). Intention is a question of fact and as our Supreme Court has said: "The intention of the parties manifested by their words and acts is essential to determine whether a contract was entered into and what its terms were. . . . This determination requires a finding of mutuality of obligation. . . ." Dumunchel Paper Co., 154 Conn. 343, 347,225 A.2d 797 (1974).
The plaintiff has maintained that he agreed to become associated with the firm because Danaher offered him a "percentage partnership" which he accepted and, therefore, he had an enforceable contract in this regard which the defendant has breached and he is accordingly entitled to an accounting and damages. This court does not agree. The plaintiff had the burden of proof on every count of his complaint and he has not proven, as he must, that there was a contract as claimed.
This conclusion of no contract is based on the credible evidence and the law, as it is supported by the conduct of the parties which has been set out at length above. There are times when what a person is about may be disclosed from an examination of his own acts but, on occasion, that becomes ever clearer when the interaction and sequences of his behavior, express and fairly to be inferred, with those of others in the context of the ebb and flow of relevant circumstances are considered. The plaintiff did CT Page 4436 not until unusually late in his association with DTLN assert that he had a contractural arrangement for a "percentage share" or share in the profits of the firm. True, he did become a "principal" as of January 1, 1986 but the credible evidence does not disclose that this entitled him to a percentage share. He accepted his 1986 bonus in June 1987 when he knew that the amount of his bonus (over and above his salary) was based on the subjective evaluation of the four senior partners. He did not claim, and certainly did not communicate anything in writing to the senior partners at that time, asserting that this was a percentage of the profits to which he was entitled. Moreover, he said nothing to any of them at that time about any pre-existing entitlement to a share in the profits. Again when he wrote his review summary in September 1987 to the senior partners, he did not assert or claim that he was entitled to any percentage of the profits or share of the profits as he did later on on December 21, 1987. That he should have said something about it at that time it seems, would have been quite reasonable and expected from one who later claimed that he was so entitled. Thereafter, the plaintiff's discussions with Neal and Tedford on December 8, 1987 concerning his 1987 bonus and his conduct attending that meeting including his same day deposit of the bonus check of December 11, 1987, further weakens his percentage or share in profit claim.
It was only in the letter of December 21, 1987 delivered to DTLN that the plaintiff made the claims he is now making. In this letter, which the defendant characterized as an ultimatum, the plaintiff then made the claims set out above. Its timing, coming as it did less than two weeks after he deposited the December 11th bonus check, the two trips to Washington, his knowledge that he knew before the December 18th interview that Marianna Smith had to approve any attorney Austern wanted to hire, the complete identity of the December 21st letter to the senior partners with the draft letter faxed to his attorney on December 16th, his December 18th interview with Marianna Smith, and his failure to respond to Lagnese's invitation for a meeting on December 28, 1987 to discuss, the "whole matter", do not induce belief in support of his claims when taken in conjunction with all the facts and circumstances of this case. In addition to what has been said, it is pertinent to note here that "Evidence, to be worthy of credit, must not only proceed from a credible source, but must, in addition, be `credible' in itself, by which is meant that it shall be so natural, reasonable and probable in view of the transaction which it describes or to which it relates, as to make it easy to believe . . . Credible testimony in fact which meets the test of plausibility." Indiana Metal Products v. N.L.R.B., 442 F.2d 46,52 (Cir. 7-1971). "Credibility involves more than demeanor. It apprehends the over-all evaluation of testimony in the light of its rationality or internal consistency and the manner in which it hangs together other evidence." Carbo v. United States, 314 F.2d 718, CT Page 4437 749 (Cir. 9-1963): Port Terminal Warehousing v. John S. James Co., 92 F.R.D 100, 107 (S.D.Ga. — 1981). As already indicated, this court has concluded that there is simply no contract as the plaintiff claims.
This conclusion is not required to be otherwise even though the plaintiff also appears to argue that the defendant's claim that the alleged oral promise of a percentage partnership was too indefinite to be enforceable is without merit. The plaintiff argues here that this claim is of indefiniteness is specious because the law is that "where an agreement leaves an important, term to be fixed by one of the parties, that party's failure to provide that term allows a court to grant relief on the basis of the aggrieved party's good faith definition of the missing term." for which he cites 1 Farnsworth, Contract 3.28. This claim cannot be accepted because the court has already concluded that; there simply was no contract at all as the plaintiff claims. Moreover, the "indefiniteness" claim of the defendant is only its fall-back position in the event the court found a contract in the first place. The bargain, i.e., a percentage partnership or share in the profits, the plaintiff contends for simply has not been proven.
A word should be said about "payment." While the court is not required to reach this special defense to all counts, it is pointed out that the defendant demonstrated that it has paid the plaintiff in full all that he is entitled to. See Rosenberg v. Burlingame, 120 Conn. 695, 181 A. 927 (1935); Archambault v. Jamelle, 100 Conn. 690, 124 A. 820 (1924); 60 Am. Jur.2d Payment, 136, 171.
The second count of the complaint seeks an accounting. That relief and an order for it would only be proper in the event that the plaintiff had prevailed on the first count. He has not and, accordingly, no such relief or order can be entered on that count.
As to the third count, on the law and on the credible evidence, the court concludes that the plaintiff was not wrongfully terminated as alleged but rather that he voluntarily left his employment with the defendant DTLN on the culmination of circumstances that he found enabled his return to Washington, D.C. As to the fourth count, on the law and credible evidence, the court concludes that the defendant DTLN did not breach its employment agreement with the plaintiff as alleged.
Judgment is ordered to enter for the defendant DTLN on all four counts of the complaint.
ARTHUR H. HEALEY STATE TRIAL REFEREE CT Page 4438
FOOTNOTES